## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRIS LEWIS, derivatively on behalf of COTY INC., <br><br>     Plaintiff, <br><br>     vs. <br><br> LAMBERTUS "BART" BECHT, CAMILLO PANE, PIERRE LAUBIES, PATRICE DE TALHOUËT, PIERRE-ANDREA TERISSE, PETER HARF, BEATRICE BALLINI, SABINE CHALMERS, JOACHIM FABER, OLIVIER GOUDET, ANNA-LENA KAMENETZKY, PAUL S. MICHAELS, ERHARD SCHOEWEL, and ROBERT SINGER, <br><br>     Defendants, <br><br>     and <br><br> COTY INC., <br><br>     Nominal Defendant. | Case No.   20-cv-9685 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Chris Lewis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Coty Inc. ("Coty" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Lambertus "Bart" Becht, Camillo Pane, Pierre Laubies, Patrice de Talhouët, Pierre-Andrea Terisse, Peter Harf, Beatrice Ballini, Sabine Chalmers, Joachim Faber, Olivier Goudet, Anna-Lena Kamenetzky, Paul S. Michaels, Erhard Schoewel, and Robert Singer (collectively, the "Individual Defendants," and together with Coty, the "Defendants") for breaches of their fiduciary duties as directors and/or

officers of Coty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Coty, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Coty's directors and officers from October 3, 2016 through May 28, 2020, both dates inclusive (the "Relevant Period").

2.      Incorporated in Delaware and headquartered in New York, Coty is one of the world's largest multi-segmented beauty companies, with a substantial portfolio of fragrance, color cosmetics, hair color and styling, and skin and body care products. Coty operates three specific segments: (1) Consumer Beauty, which concentrates on color cosmetics, retail hair coloring and styling products, body care, and mass fragrances sold primarily in the mass retail channels; (2) Luxury, which concentrates on prestige fragrances and skincare brands; and (3) Professional Beauty, which concentrates on servicing nail and hair salons and other professional beauticians.

3.      In July 2015, Coty began acting on plans to acquire The Procter & Gamble Company's ("P&G") specialty beauty business ("P&G Beauty"), which included operations

relating to P&G's global fine fragrances, salon professional, cosmetics, and retail hair color and styling businesses. According to the Individual Defendants, acquiring P&G Beauty would, among other things, elevate the Company's business prospects and create "accelerated value creation" for Coty's shareholders.

4.     The Company completed its acquisition of P&G Beauty on October 1, 2016, for which the Company paid approximately $12 billion (the "P&G Merger"). Following the acquisition, the Individual Defendants frequently lauded the benefits of P&G Beauty, and represented that the ongoing integration of P&G Beauty into Coty was proceeding smoothly. Yet, in reality, due to issues with the integration of P&G Beauty, the Company was facing substantial operational challenges that would negatively impact the Company's performance, as the Individual Defendants would gradually reveal beginning more than four months after the closing of the acquisition.

5.     The truth began to emerge on February 9, 2020, when the Company disclosed disappointing financial results for the second fiscal quarter of 2017, due to, among other things, "distractions associated with the merger integration efforts."  Even so, Defendant Camillo Pane ("Pane") represented, in a press release issued by the Company that day, that the "integration [was] progressing as expected, with no major issues to date" and that the Company was impacted merely by "short term challenges."

6.     However, on this news, the price of the Company's stock fell approximately 8.8%, or $1.76, dropping from $20.04 per share at the close of trading on February 8, 2017 to $18.28 per share at the close of trading on February 10, 2017, following two days of heavy trading volume.

7.     Subsequent disclosures in Company press releases revealed more details about the struggles the Company was facing pertaining to its integration of P&G Beauty, including: (1) on

August 22, 2017, when the Company reported a 10% decline in organic consumer beauty net revenue; (2) on November 7, 2017, when the Company reported an approximate decline of 9.2% in net revenue for the quarter; and (3) on July 1, 2019, when the Company reported a non-cash impairment charge of over $3 billion attributable to the Company's brands acquired from P&G.

8.     Meanwhile, the Individual Defendants' misleading disclosures continued.  For example, press releases issued by the Company repeatedly insisted that integration was going smoothly, and that Coty was "delivering on [its] merger synergies." Moreover, seven consecutive fiscal quarterly financial disclosures filed with the SEC from February 2017 to August 2018 repeated the false assertions that the Company anticipated realizing synergies resulting from the P&G Merger.

9.     In November 2019, Coty began acting on plans to acquire a 51% ownership stake in Kylie Jenner's ("Jenner")[1] existing beauty business, Kylie Cosmetics and Kylie Skin (together the "Kylie Brands"), for approximately $600 million. According to the Individual Defendants, acquiring the Kylie Brands was a "key milestone in Coty's ongoing transformation into a more focused and agile company."[2]

10.     These assertions too, were shown to be false on May 29, 2020, when *Forbes* published an article exposing Jenner's "Web of Lies" and revealing that (1) Kylie Brands were significantly "smaller and less profitable" than previously reported; and (2) accordingly, Coty had seriously overvalued its acquisition of Kylie Brands.

---

[1] As described in the Company's press release issued on November 18, 2019, Jenner is an "entrepreneur, beauty mogul, fashion designer, author, TV personality and style icon" and is "one of the world's most-followed people on social media." Jenner launched her cosmetics brand, Kylie Cosmetics in November 2015.
[2] This transaction was expected to close in the third fiscal quarter of 2020.

11.     On this news, the price of the Company's stock fell approximately 13.4%, or $0.56, tumbling from $4.19 per share at the close of trading on May 28, 2020 to $3.63 per share at the close of trading on May 29, 2019, on heavy trading volume.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G and the Kylie Brands; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for P&G and the Kylie Brands; (3) the Company lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.    Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase approximately 0.5 million shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while two of them engaged in lucrative insider sales, netting proceeds of nearly 37.6 million. Approximately 0.5 million shares of the Company's Class A common stock were repurchased during the Relevant Period for about $4.5 million. As the Company's stock was actually only worth $3.63 per share during that time, the price at closing on May 28, 2020, the Company overpaid by over $2.7 million in total.

16.    In light of the Individual Defendants' misconduct, which has subjected the Company, two of its former Chief Executive Officers ("CEO"), its Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), its former CFO, and its former interim CEO and Chairman of the Board of Directors ("Board") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Coty's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because Coty maintains its principal executive offices in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.    Plaintiff is a current shareholder of Coty.  Plaintiff has continuously held Coty common stock at all relevant times.

### Nominal Defendant Coty

23.    Coty is a Delaware corporation with its principal executive offices at 350 Fifth Avenue, New York, New York 10118. Coty's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "COTY." Coty's publicly traded common stock is Class A Stock, which confers one vote per share at the Company's annual shareholder meetings. The Company also maintains Series B preferred stock, which is not traded publicly, and confers approximately 163.8 votes per share.

### Defendant Becht

24.    Defendant Lambertus "Bart" Becht ("Becht") served as the Company's Chairman from October 2011 to November 2018, and continued serving as a Company director until he resigned in January 2019. He previously served as the Company's interim CEO from September 2014 to September 2016.

25.    For the fiscal year ended June 30, 2019, Defendant Becht received $361,195 in compensation from the Company. This included $210,137 in fees earned or paid in cash, and $151,058 in stock awards. For the fiscal year ended June 30, 2016, Defendant Becht received $8,106,000 in compensation from the Company. This included $8,106,000 in stock awards.

26.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Becht made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/16/2016 | 3,314 | $18.14 | $60,115 |

27.    His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

28.    The Company's Schedule 14A filed with the SEC on September 20, 2018 (the "2018 Proxy Statement"), stated the following about Defendant Becht:

> **Lambertus J.H. Becht** joined the Board as Chairman in 2011 and served as the Company's interim CEO from September 2014 until October 2016. He is a Partner and Chairman of JAB Partners LLP. He also serves as the Chairman of the Board of Keurig Dr Pepper Inc. and Jacobs Douwe Egberts B.V. He is also a Director of Panera Holdings Corp., Krispy Kreme Doughnuts, Inc., Peet's Coffee & Tea, LLC and Caribou Coffee Company, Inc. (being the parent company of Einstein Noah Restaurant Group, Inc.). His prior experience includes serving as the Chief Executive Officer of Reckitt Benckiser Group plc, a leading global consumer goods company in the field of household cleaning and health and personal care, and predecessor companies from 1995 to 2011. Mr. Becht holds a Master of Business Administration degree from the University of Chicago Booth School of Business and a Bachelor of Arts degree in Economics from the University of Groningen in the Netherlands.

> As our former interim CEO, Mr. Becht has intimate knowledge of our business and operations and brings a valuable perspective to the Board. He also has many years of experience at publicly traded and private companies in the consumer products industry, including executive, operating, marketing, finance and international business experience, and was Chief Executive Officer of Reckitt Benckiser. In addition, Mr. Becht has significant experience overseeing transformational mergers and integration. In light of his background and experience, we believe Mr. Becht is also well qualified to serve as Chairman of our Board.

**Defendant Pane**

29.    Defendant Pane served as the Company's CEO and as a Company director from September 2016 to November 2018. He previously served as a member of Coty's Executive Committee beginning in July 2015 as Executive Vice President, Category Development.

30.     For the fiscal year ended June 30, 2018, Defendant Pane received $9,722,081 in compensation from the Company. This included $543,629 in salary, $2,828,497 in stock awards, and $6,349,955 in all other compensation. For the fiscal year ended June 30, 2017, Defendant Pane received $12,419,073 in compensation from the Company. This included $850,834 in salary, $900,000 in bonus, $3,008,386 in stock awards, $6,540,000 in option awards, $854,272 in non-equity incentive plan compensation, and $265,581 in all other compensation.

31.     The Company's 2018 Proxy Statement stated the following about Defendant Pane:

**Camillo Pane** joined the Board in 2016. He has served as the Company's Chief Executive Officer and a member of the Company's Executive Committee since October 2016. Prior to that, he served as Executive Vice President, Category Development from July 2015. Prior to joining the Company, Mr. Pane spent 20 years with Reckitt Benckiser Group plc, where he held numerous high profile international marketing and general management roles throughout his career, in both developed and emerging markets, most recently as Senior Vice President, Global Category Officer Consumer Health from July 2011 until July 2015. Mr. Pane holds a degree in business administration from the University of Bocconi in Milan.

As both Chief Executive Officer and a director, Mr. Pane provides valuable perspective and promotes unified leadership and direction for both the Board and management. Mr. Pane brings to our Board many years of experience in the consumer products industry, including marketing, management and international business experience. We believe these experiences, along with his creativity in working with global brands, are advantageous to us and benefit the Board with respect to his ability to identify, understand and address challenges and opportunities we face.

**<u>Defendant Laubies</u>**

32.     Defendant Pierre Laubies ("Laubies") served as the Company's CEO, as a member of the Executive Committee, and as a Company director from September 2018 until May 2020.

33.     For the fiscal year ended June 30, 2020, Defendant Laubies received $21,660,857 in compensation from the Company. This included $1,247,401 in salary, and $20,413,456 in all other compensation. For the fiscal year ended June 30, 2019, Defendant Laubies received

$16,211,992 in compensation from the Company. This included $958,320 in salary, $4,999,994 in stock awards, $10,156,075 in option awards, and $97,603 in all other compensation.

34.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Laubies made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/27/2020 | 3,260,329 | $11.49 | $37,474,221 |

35.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

36.     The Company's Schedule 14A filed with the SEC on September 25, 2019 (the "2019 Proxy Statement") stated the following about Defendant Laubies:

**Pierre Laubies** joined the Board in November 2018 when he became the Company's Chief Executive Officer and a member of the Company's Executive Committee. In January 2019, Mr. Laubies also assumed the leadership for formulating and implementing the strategic vision for the Consumer Beauty division as its President. Prior to joining the Company, Mr. Laubies served as the Chief Executive Officer of Jacobs Douwe Egberts B.V., one of the world's leading coffee and beverage companies, from September 2013 to March 2018. Mr. Laubies has over 25 years of experience at international companies, including consumer goods manufacturer Mars, Incorporated where he served in a variety of roles across categories, markets and regions, including as President of the Global Pet Care division. He has also served as a director of Continental Foods Europe NV since July 2018. Mr. Laubies holds a Masters degree in Economics from Sciences Politiques de Paris, Université Sorbonne and a Law degree from the Université Paris 2 Pantheon-Assas.

As both Chief Executive Officer and a director, Mr. Laubies provides valuable perspective and promotes unified leadership and direction for both management and the Board. Mr. Laubies also brings to our Board many years of operational and financial experience in the international consumer products and packaged goods industry and working with global brands. We believe that these experiences, along with his experience in leading companies through transformation and integration,

are advantageous to the Company and benefit the Board with respect to his ability to identify, understand and address challenges and opportunities we face.

### Defendant Talhouët

37.     Defendant Patrice de Talhouët, ("Talhouët") served as the Company's CFO from December 2013 until he resigned in September 2018. He previously joined the Company's Executive Committee in January 2014.

38.     For the fiscal year ended June 30, 2019, Defendant Talhouët received $602,671 in compensation from the Company. This included $339,768 in salary, and $262,903 in all other compensation. For the fiscal year ended June 30, 2018, Defendant Talhouët received $3,450,719 in compensation from the Company. This included $828,627 in salary, $1,316,420 in stock awards, $826,000 in option awards, $314,919 in non-equity incentive plan compensation, and $164,753 in all other compensation. For the fiscal year ended June 30, 2017, Defendant Talhouët received $2,929,867 in compensation from the Company. This included $716,756 in salary, $87,729 in bonus, $1,504,193 in stock awards, $447,941 in non-equity incentive plan compensation, $173,248 in all other compensation.

### Defendant Terisse

39.     Defendant Pierre-Andrea Terisse ("Terisse") has served as the Company's CFO, COO, and as a member of the Executive Committee since February 2019. According to the Company's Schedule 14A filed with the SEC on September 24, 2020 (the "2020 Proxy Statement"), as of August 31, 2020, Defendant Terisse beneficially owned 844,952 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on August 31, 2020 was $3.58, Defendant Terisse owned over $3,024,928 worth of Coty stock.

40.     For the fiscal year ended June 30, 2020, Defendant Terisse received $14,955,740 in compensation from the Company. This included $869,061 in salary, $10,148,192 in stock awards, $336,000 in option awards, $3,482,847 in non-equity incentive plan compensation, and $119,640 in all other compensation. For the fiscal year ended June 30, 2019, Defendant Terisse received $5,332,582 in compensation from the Company. This included $323,310 in salary, $2,909,611 in stock awards, $2,030,679 in option awards, $58,082 in non-equity incentive plan compensation, and $10,900 in all other compensation.

41.     The Company's 2020 Proxy Statement stated the following about Defendant Terisse:

> **Pierre-André Terisse** has served as Chief Financial Officer since February 2019 and added the responsibilities as Chief Operating Officer in February 2020 and is a member of our Executive Committee. Mr. Terisse oversees our finance organization. Mr. Terisse has nearly 30 years of public company finance experience, the majority of which was spent at Danone, S.A., a leading global food processing group, most recently as General Manager of Danone's Africa Division from 2015 to 2017, where he designed and implemented the division's strategy, operational foundations and innovation pipeline, and Group Chief Financial Officer and member of the Executive Committee from 2008 to 2015, and Secretary of the Board from 2010. In 2017, he founded MAYI Africa, a privately-held bottled water company. Mr. Terisse holds a Bachelor's Degree in Business and Management from IAE Lyon III and a Master's Degree in Finance from EM Lyon Business School.

**Defendant Harf**

42.     Defendant Peter Harf ("Harf") has served as the Company's Chairman of the Board since November 2018 and as a Company director since 1996. He previously served as the Company's interim CEO from May 31, 2020 to August 31, 2020, and as the Company's CEO from 1993 to 2001. Defendant Harf also serves as Managing Partner and Chairman of JAB Holding Company S.á.r.l. (together with its affiliates "JAB"),[3] the Company's majority shareholder, and

---

[3] According to the 2020 Proxy Statement, JAB beneficially owns approximately 461,299,223 shares of the Company's Class A common stock, which represents approximately 60.3%, as of August 31, 2020.

Managing Director of Lucresca SE ("Lucresca") and Agnaten SE ("Agnaten"), privately-owned holding companies affiliated with JAB.[4] According to the 2020 Proxy Statement, as of August 31, 2020, Defendant Harf beneficially owned 12,324,548 shares of the Company's Class A common stock, representing approximately 1.6% of outstanding shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on August 31, 2020 was $3.58, Defendant Harf owned over $44.1 million worth of Coty stock.

43.    The Company's 2020 Proxy Statement stated the following about Defendant Harf:

**Peter Harf** joined the Board in 1996 and has served as Chairman of the Board since November 2018. Mr. Harf served as Chief Executive Officer of the Company from 1993 to 2001, as interim Chief Executive Officer from May 31, 2020 to August 31, 2020, as Chairman of the Board from 2001 to 2011 and Chair of the RNC from 2011 until December 2016. He is a Managing Partner and Chairman of JAB Sarl, having joined JAB Sarl in 1981, and Managing Director of Lucresca SE and Agnaten SE, privately-owned holding companies affiliated with JAB Group. Mr. Harf is also a Director of Keurig Dr Pepper Inc. (since July 2018), Jacobs Douwe Egberts B.V., Peets Coffee & Tea Inc. and Compassion First. He is also co-founder and Executive Chairman of Delete Blood Cancer DKMS. Previously, he served as Deputy Chairman of Reckitt Benckiser plc and Chairman of Anheuser-Busch InBev SA/NV, Chairman of Espresso House Holding AB and Director of Panera Bread Company, Pret A Manger, Caribou Coffee Company/Einstein Noah and Krispy Kreme Doughnuts Inc. Mr. Harf holds a Master of Business Administration degree from Harvard Business School and a Diploma and a Doctorate in Economics from the University of Cologne in Germany.

As our former Chief Executive Officer, Mr. Harf has intimate knowledge of our business and operations and brings a valuable perspective to the Board. In addition, Mr. Harf brings to our Board more than 30 years of experience in our industry, including executive, operating, strategic planning and international business

---

[4] JAB owns a majority share of the Company's Class A common stock through Cottage Holdco B.V. ("Cottage"), a private limited liability company organized under the laws of the Netherlands, a wholly owned subsidiary of JAB Cosmetics B.V., which is a private limited liability company organized under the laws of the Netherlands, and is a direct subsidiary of JAB Holdings B.V. and an indirect subsidiary of Lucresca and Agnaten, each of which is a company with its registered seat in Austria, and JAB Holdings B.V., a Netherlands corporation, Lucresca and Agnaten indirectly have shared voting and investment control over the Company's Class A shares held by Cottage. Lucresca and Agnaten are each controlled by Renate Reimann-Haas, Wolfgang Reimann, Stefan Reimann-Andersen and Matthias Reimann-Andersen, who with Defendant Harf and Defendant Goudet exercise voting and investment authority over the Company's shares held by JAB Cosmetics B.V.

experience. In light of his background and experience, we believe that Mr. Harf is also well qualified to serve as Chairman of the Board.

**Defendant Chalmers**

44.     Defendant Sabine Chalmers ("Chalmers") served as a Company director from April 2017 to November 3, 2020.  She also serveds as a member of the Audit and Finance Committee and the Special Committee.[5]

45.     For the fiscal year ended June 30, 2020, Defendant Chalmers received $219,100 in compensation from the Company. This included $100,000 in fees earned or paid in cash, and $119,100 in stock awards.

46.     The Company's 2019 Proxy Statement stated the following about Defendant Chalmers:

> **Sabine Chalmers** joined the Board in 2017. Ms. Chalmers has served as Group General Counsel of BT Group plc, a U.K. telecommunications services company, since April 2018. Prior to that, she served as Chief Legal Officer and Secretary to the Board of Directors of Anheuser-Busch InBev SA/NV (formerly, InBev SA), a beer and brewery company, from December 2004 to August 2017. Ms. Chalmers joined Anheuser-Busch InBev SA/NV from Diageo plc, where she held a number of senior legal positions in various geographies from 1993, including General Counsel of its U.S. and Latin American businesses. Prior to Diageo, Ms. Chalmers was an Associate at the law firm of Hogan Lovells in London, specializing in mergers and acquisitions and in commercial property transactions. She has also served as a director of Anheuser-Busch InBev SA/NV since April 2019 and served on the Board of Directors of Association of Corporate Counsel from 2005 to 2017, and as its Chair from October 2015 to January 2017. In addition, Ms. Chalmers is a member of the Board of Trustees of the Royal National Theatre London. Ms. Chalmers qualified as a Solicitor in England and is a Member of the New York State Bar. She holds an L.L.B from the London School of Economics.

**Defendant Ballini**

---

[5] After JAB commenced a tender offer to acquire up to 150 million additional shares of the Company's Class A common stock at a price of $11.65 per share in cash on February 13, 2019, the Board formed a Special Committee to review and evaluate the tender offer to determine a course of action in the best interest of the Company's stockholders. On March 18, 2019, the Company announced that the Special Committee had unanimously recommended that stockholders of the Company accept the tender offer and tender their shares pursuant to the offer.

47.     Defendant Beatrice Ballini ("Ballini") has served as a Company director since September 2019. She also serves as the Chair of the Remuneration and Nominating Committee.

48.     For the fiscal year ended June 30, 2020, Defendant Ballini received $170,862 in compensation from the Company. This included $77,869 in fees earned or paid in cash, and $92,993 in stock awards.

49.     The Company's 2020 Proxy Statement stated the following about Defendant Ballini:

> **Beatrice Ballini** joined the Board in September 2019 and has served as the Chair of the RNC since May 31, 2020. Ms. Ballini is a senior member of the Retail Practice at Russell Reynolds Associates, a global leadership advisory and search firm, where she leads family business services and is a leader of the Board and CEO Advisory Partners group. Prior to joining Russell Reynolds Associates 21 years ago, Ms. Ballini was the Chief Executive Officer of a prominent men's clothing manufacturer in Milan where she assisted with the company's strategic growth. Prior to that, she held positions at Goldman Sachs & Co. and Bain & Co. Ms. Ballini has also taught in the Master in Marketing program at Sciences Politiques in Paris and is a member of the European and Middle Eastern Executive Board of the MIT Sloan School of Management. She holds a laurea degree in chemical engineering from the Polytechnic of Milan, a Master of Science from the Massachusetts Institute of Technology and an MBA from the MIT Sloan School of Management.

### **Defendant Faber**

50.     Defendant Joachim Faber ("Faber") served as a Company director from 2010 until November 2019. He served as a member of the Audit and Finance Committee. Defendant Faber also serves as Chairman of the Shareholder Committee of JAB Holding Company S.á.r.l.

51.     For the fiscal year ended June 30, 2020, Defendant Faber received $75,152 in compensation from the Company. This included $34,973 in fees earned or paid in cash, and $40,179 in stock awards.

52.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Faber made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/15/2016 | 993 | $18.14 | $18,013 |

53.     His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

54.     The Company's 2018 Proxy Statement stated the following about Defendant Faber:

**Joachim Faber** joined the Board in 2010. Mr. Faber is also the Chairman of the Supervisory Board of Deutsche Börse AG, Frankfurt and Chairman of the Shareholder Committee of JAB Holding Company S.à r.l. Mr. Faber was a member of the board of HSBC Holdings PLC, London from March 2012 until April 2018 and a member of the Supervisory Board of OSRAM Licht AG and the Chairman of its audit committee until June 2014 and a member of the board of Allianz S.A., Paris until March 2017. Until 2011, Mr. Faber served as the Chief Executive Officer of Allianz Global Investors, a global asset management company, and a member of the management board of Allianz SE in Munich. Prior to joining Allianz in 1997, he worked for 14 years in various positions for Citicorp in Frankfurt and London. He was nominated to the Corporate Governance Codex Commission in September 2013. He serves on the board of German Cancer Aid in Bonn and the European School for Management and Technology in Berlin. Mr. Faber graduated from the University of Bonn with a degree in Law. He received his PhD degree from the Postgraduate National School of Public Administration Speyer, Germany after completing his research at the Sorbonne University in Paris.

Mr. Faber brings to our Board more than 25 years of experience in the banking and finance industries, as well as deep financial expertise and significant experience running a large corporation with multinational operations, including as Chief Executive Officer of Allianz.

### Defendant Goudet

55.     Defendant Olivier Goudet ("Goudet") has served as a Company director since 2013. Defendant Goudet also serves as Managing Partner and CEO of JAB, the Company's majority shareholder. According to the 2020 Proxy Statement, as of August 31, 2020, Defendant Goudet beneficially owned 129,129 shares of the Company's Class A common stock. Given that

the price per share of the Company's Class A common stock at the close of trading on August 31,

2020 was $3.58, Defendant Goudet owned nearly $462,282 worth of Coty stock.

56.     For the fiscal year ended June 30, 2020, Defendant Goudet received $219,100 in

compensation from the Company. This included $100,000 in fees earned or paid in cash, $119,100

in stock awards.

57.     The Company's 2020 Proxy Statement stated the following about Defendant

Goudet:

> **Olivier Goudet** joined the Board in 2013. Mr. Goudet is a Managing Partner and
> Chief Executive Officer of JAB Sarl, a position he has held since 2012. He serves
> as Chairman of the Board of Jacobs Douwe Egberts B.V., Peet's Coffee & Tea,
> Inc., Panera Bread Company, Pret A Manger and Krispy Kreme Doughnuts, Inc.
> He is also a Director of Keurig Dr Pepper Inc. (since July 2018), Caribou Coffee
> Company, Inc. (being the parent company of Einstein Noah Restaurant Group,
> Inc.), Espresso House Holding AB and Compassion First. He served as a director
> of Anheuser-Busch InBev SA/NV from 2011 to April 2019, serving as Chairman
> of the Board from 2016 to April 2019. He is the former Executive Vice President
> and Chief Financial Officer of Mars, Incorporated and served as an independent
> advisor to the Mars, Incorporated Board of Directors. Mr. Goudet began his career
> at Mars, Incorporated, serving on the finance team of its French business and held
> several senior executive positions at the VALEO Group, including Group Finance
> Director. Mr. Goudet holds a Degree in Engineering from l'Ecole Centrale de Paris
> and graduated from the ESSEC Business School in Paris with a major in Finance.
>
> Mr. Goudet brings to our Board extensive financial expertise and senior executive
> experience, including experience in strategic planning and leadership of complex
> organizations, as well as significant governance and oversight experience attained
> through his tenure as a director of several public companies. In addition, Mr.
> Goudet has significant experience overseeing transformational mergers and
> integration.

### Defendant Kamenetzky

58.     Defendant Anna-Lena Kamenetzky ("Kamenetzky") served as a Company director

from February 2019 until November 2019. She also serves as a partner of JAB Holding Company

S.á.r.l.

59.     For the fiscal year ended June 30, 2019, Defendant Kamenetzky received $50,806 in compensation from the Company. This included $50,806 in stock awards.

**Defendant Michaels**

60.     Defendant Paul S. Michaels ("Michaels") has served as a Company director since 2015. He also serves as a member of the Remuneration and Nomination Committee. According to the 2020 Proxy Statement, as of August 31, 2020, Defendant Michaels beneficially owned 685 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on August 31, 2020 was $3.58, Defendant Michaels owned over $2,452 worth of Coty stock.

61.     For the fiscal year ended June 30, 2020, Defendant Michaels received $219,100 in compensation from the Company. This included $100,000 in fees earned or paid in cash, and $119,100 in stock awards.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Michaels:

> **Paul S. Michaels** joined the Board in 2015. He also has served as a Director of Krispy Kreme Doughnuts Inc. since August 2017 and Keurig Dr Pepper Inc. since July 2018. Prior to joining our Board, Mr. Michaels served as the President of Mars, Incorporated, a manufacturer of food products and parent company of William Wrigley Jr. Co., from January 2004 to January 2015. Mr. Michaels began his career at The Procter & Gamble Company and later moved to Johnson & Johnson, where he spent 15 years building many of the company's flagship brands. Mr. Michaels holds a Bachelor of Arts from the University of Notre Dame.
>
> Mr. Michaels brings to our Board senior executive leadership experience as well as demonstrated expertise and creativity in launching, building and supporting global brands in the consumer products industry, as well as financial acumen developed through his executive experience.

**Defendant Schoewel**

63.     Defendant Erhard Schoewel ("Schoewel") has served as a Company director since 2006. He also serves as a member of the Remuneration and Nomination Committee and the Special

Committee. According to the 2020 Proxy Statement, as of August 31, 2020, Defendant Schoewel beneficially owned 391,473 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on August 31, 2020 was $3.58, Defendant Schoewel owned over $1.4 million worth of Coty stock.

64.     For the fiscal year ended June 30, 2020, Defendant Schoewel received $279,100 in compensation from the Company. This included $160,000 in fees earned or paid in cash, and $119,100 in stock awards.

65.     The Company's 2020 Proxy Statement stated the following about Defendant Schoewel:

> **Erhard Schoewel** joined the Board in 2006, and has served as the Lead Independent Director from November 2018 to May 31, 2020. He also served as the Chair of the Remuneration and Nomination Committee until May 31, 2020. From 1999 to 2006, he was Executive Vice President responsible for Europe at Reckitt Benckiser plc. From 1979 to 1999, he held positions of increasing responsibilities at Benckiser. Prior to that, he worked for PWA Waldhof. In 2012, Mr. Schoewel was elected to the Supervisory Board of the Jahr Holding GmbH & Co. KG in Hamburg Germany. In 2018, he became a member of the advisory Board of Medoderm GmbH. From 2007 to 2015, he was Chairman of Birdseye Iglo Ltd London and director of Phorms SE Berlin. Mr. Schoewel received a Diplom-Kaufmann degree from University of Pforzheim.
>
> Mr. Schoewel brings to our Board extensive experience in the consumer products industry, including executive, operating and international business experience, as well as governance and advisory experience from serving on the boards of other companies.

### Defendant Singer

66.     Defendant Robert Singer ("Singer") has served as a Company director since 2010. He also serves as the Chair of the Audit and Finance Committee, and as a member of the Special Committee. According to the 2020 Proxy Statement, as of August 31, 2020, Defendant Singer beneficially owned 284,982 shares of the Company's Class A common stock. Given that the price

per share of the Company's Class A common stock at the close of trading on August 31, 2020 was $3.58, Defendant Singer owned over $1,020,235 million worth of Coty stock.

67.     For the fiscal year ended June 30, 2020, Defendant Singer received $249,100 in compensation from the Company. This included $130,000 in fees earned or paid in cash, and $119,100 in stock awards.

68.     The Company's 2020 Proxy Statement stated the following about Defendant Singer:

> **Robert Singer** joined the Board in 2010, and serves as Chair of the Audit and Finance Committee and as Lead Independent Director since May 31, 2020. From 2006 to 2009 he served as Chief Executive Officer of Barilla Holding S.p.A., an Italian food company, and before that, he served as the President and Chief Operating Officer of Abercrombie and Fitch Co. from 2004 to 2005. He served as Chief Financial Officer of Gucci Group N.V. from 1995 to 2004. Mr. Singer started his career at Coopers & Lybrand in 1977. Mr. Singer also served as a director of Gianni Versace S.p.A. from 2009 to December 2016 and served as a director of Mead Johnson Nutrition from 2009 to June 2017. He has also served as a director and chair of the audit committees of Tiffany & Co. since 2012, Keurig Dr. Pepper Inc. since July 2018, and Panera Bread Company since September 2017 and provides similar services to certain private companies affiliated with JAB Group. Since 2019, Mr. Singer has served as a member of the board of the private fashion company, Acne Studios. Mr. Singer has served as an advisor to the private equity firm IDG Capital, a private equity firm, since November 2018, and served as a senior advisor to CCMP Capital Advisors, LLC from 2011 to January 2016. He also served as a director and Chairman of the audit committee of Jimmy Choo PLC from September 2014 to 2017. He received a Bachelor of Arts Humanities degree from Johns Hopkins University, a Master of Arts degree in Comparative Literature from University of California, Irvine and graduated from New York University with a Master of Science in Accounting.
>
> Mr. Singer brings to our Board many years of operating, financial and executive experience, including in the fashion industry. Mr. Singer has significant public company board and audit committee experience and extensive risk management experience.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers, directors, and/or fiduciaries of Coty and because of their ability to control the business and corporate affairs of Coty, the Individual

Defendants owed Coty and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Coty in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Coty and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Coty and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Coty, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers and directors of Coty were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Coty, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised Coty's Board at all relevant times.

74.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.     To discharge their duties, the officers and directors of Coty were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Coty were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Coty's own Code of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Coty conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Coty and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Coty's operations would comply with all applicable laws and Coty's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.     Each of the Individual Defendants further owed to Coty and the shareholders the duty of loyalty requiring that each favor Coty's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

77.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Coty and were at all times acting within the course and scope of such agency.

78.     Because of their advisory, executive, managerial, and directorial positions with Coty, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Coty.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

81.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

82.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Coty was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

83.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Coty, and was at all times acting within the course and scope of such agency.

## COTY'S CODE OF CONDUCT

85.     Coty's Code of Conduct provides that it "applies to all directors, officers, employees, and contractors of Coty globally."

86.     In a section titled, "Compliance with Laws, Regulations & Company Policy," the Code of Conduct states the following, in relevant part:

> Coty is committed to assuring that all employees behave in an ethical and lawful manner. Failure to comply with the policies described in the Code of Conduct has severe consequences for Coty, including damage to its good name and trade and

consumer relations. Conduct that violates the Code of Conduct may also violate national and local laws, subjecting those personnel involved to prosecution, fines, and perhaps even imprisonment. Any employee who violates the Code of Conduct will be acting outside the scope of his or her employment, and may be subject to disciplinary action, including termination of employment.

Coty also insists that all of its business be conducted in compliance with all applicable laws, rules and regulations. It is the responsibility of every director, officer, employee and contractor to comply with all applicable governmental laws and regulations at any level in the states and countries in which Coty operates. Failure to obey all applicable laws and regulations violates our Code of Conduct, and may expose both Coty and responsible persons to criminal or civil prosecution. Any illegal action will be dealt with swiftly, and violations will be reported to the proper authorities.

87.     The section of the Code of Conduct titled "Compliance with Laws, Regulations &

Company Policy," further provides:

NOTE: You must immediately report any known or suspected ethical or legal misconduct. Should unethical or unlawful behavior occur, Coty must stop it as soon as reasonably possible after it is discovered. Coty will discipline not only those who engage in it, but also those who fail to exercise appropriate supervision and oversight. Coty strongly encourages all employees to report a violation of which they are aware.

*** 

If you become aware or reasonably believe that there is conduct that is illegal or violates the Code of Conduct, you must report that information immediately. You may report to your manager, your local Human Resources manager, Legal or the Compliance Office. Alternatively, you may anonymously report any violation or possible violation by calling the Coty Code Hotlines. The Chief Legal Officer has ultimate responsibility for overseeing compliance with all applicable laws, the Code of Conduct, and all related Company policies and procedures.

88.     In a section titled, "Insider Information," the Code of Conduct states the following,

in relevant part:

Coty directors, officers, employees and contractors who are aware of material information regarding Coty or another public company that has not been disclosed to the public (i.e., facts which may affect the market price for that company's securities and investors' decisions to trade therein) must hold that information in strictest confidence, and refrain from buying or selling or influencing the decisions of others to buy or sell the securities of any such company until such information

has been publicly disclosed and enough time has elapsed to allow investors to react to the information.

89.     In a section titled, "Disclosures, Use & Recording of Corporate Funds," the Code of Conduct states the following:

> Employees who are responsible for making Coty's periodic reports and other disclosures or who come into contact with some financial information concerning Coty - consistent with their duties and responsibilities – have a duty to do so in such a manner that all entries in Coty's records give an *honest picture of the results of our operations and our financial position*.
>
> Coty discloses information to the public on a regular basis. Employees responsible for making Coty's periodic reports and other documents filed with the Securities and Exchange Commission (the "SEC"), or otherwise disclosed publicly, including all financial statements and other financial information, are responsible for preparing these disclosures in compliance with applicable securities laws and rules. *Coty's SEC filings and other public communications should contain full, fair, accurate, timely and understandable disclosures*.
>
> In addition, *Coty business records must be prepared accurately, conscientiously and in reasonable detail*. They must reflect all transactions involving Coty and all other events that are the subject of a specific regulatory record-keeping requirement. All transactions must be executed in accordance with Coty's general or specific authorization, and comply with generally accepted accounting principles.
>
> Each person who is involved in Coty's disclosure process must: (a) be familiar with and comply with Coty's accounting and disclosure rules, controls and procedures, and generally accepted accounting principles, and cooperate fully with Coty's internal and external auditors, and (b) *take all necessary steps such that all filings with the SEC and all other public communications about the financial and business condition of Coty provide full, fair, accurate, timely and understandable disclosure*.

(Emphasis added.)

90.     In a section titled, "Fair Dealing & Compliance with Antitrust Laws," the Code of Conduct states the following, in relevant part:

> Each Coty director, officer, employee and contractor must deal fairly with Coty's customers, suppliers, service providers, competitors, external advisers, employees and anyone else with whom he or she has contact in the course of performing his or her job. You are prohibited from taking unfair advantage of anyone through

manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

91.     In the section titled, "Company Documents," the Code of Conduct also states the following, in relevant part:

> All Company Documents must be retained and discarded in accordance with Coty's document retention policy, which is available from the Legal Department. If you have any doubt as to whether a particular document should be retained, you should consult with the Legal Department before destroying it. Furthermore, you must not make inappropriate modifications to a Company Document that alters or destroys the document's integrity or accuracy.

92.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, and aiding and abetting thereof.  Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, maintain the accuracy of company records and reports, conduct business in an honest and ethical manner, properly report violations of the Code of Conduct, and uphold the employee and director responsibilities related thereto.

## **THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

93.     Founded in 1904, Coty has developed into one of the world's largest multi-segmented beauty companies, with a substantial portfolio of brands across fragrance, color cosmetics, hair color and styling, and skin and body care. Coty operates three specific segments: (1) Consumer Beauty, which concentrates on color cosmetics, retail hair coloring and styling

products, body care and mass fragrances sold primarily in the mass retail channels; (2) Luxury, which concentrates on prestige fragrances and skincare brands; and (3) Professional Beauty, which concentrates on servicing nail and hair salons and other professional beauticians. Coty's revenue for fiscal year 2020 was approximately $4.7 billion.

94.     In 1992, JAB, a privately-held German conglomerate focused on long-term investments in companies with premium brands, bought control of Coty. In 1995, JAB incorporated Coty in Delaware and continued to operate Coty as a private company until June 2013, when Coty went public with a dual-class capital structure in its initial public offering. After the initial public offering, JAB continued to control approximately 85% of Coty's total voting power. In 2014, Coty agreed to repurchase certain of its shares, which left JAB with control of approximately 97% of Coty's voting power until 2016, when Coty completed the P&G Merger.[6] Thereafter, on February 13, 2019, JAB commenced a tender offer to purchase up to 150 million additional shares of Coty, which, upon recommendation from a Special Committee, the Board approved.[7]

95.     In early July 2015, the Company announced its intention to acquire P&G's specialty beauty business, which included operations relating to P&G's global fine fragrances, salon professional, cosmetics, and retail hair color and styling businesses. Specifically, in a press release issued on July 9, 2015 titled "Merger to Create a New Global Leader and Challenger in the Beauty Industry," the Company stated the following:

> NEW YORK--(BUSINESS WIRE)--Jul. 9, 2015-- Coty Inc. (NYSE:COTY) announced today the signing of a definitive agreement to merge The Procter & Gamble Company's (NYSE:PG) fine fragrance, color cosmetics, and hair color businesses ("P&G Beauty Business") into Coty through a tax-free Reverse Morris

---

[6] In connection to the P&G Merger, JAB agreed to convert all of its Coty Class B stock to Class A common stock, through which, JAB lost a majority voting control of Coty.

[7] According to the 2020 Proxy Statement, as of August 31, 2020, JAB beneficially owned 461,299,223 shares of the Company's Class A common stock, representing approximately 60.3% of outstanding shares as of that date.

Trust transaction. The transaction is based on a proposal by Coty valuing the P&G Beauty Business at approximately $12.5 billion at the time the proposal was made. Following the transaction, P&G shareholders will own 52% of all outstanding shares on a fully diluted basis (inclusive of all outstanding equity grants), while Coty's existing shareholders would own 48% percent of the combined company.

The transaction will instantly create one of the world's largest beauty companies, with pro forma combined annual revenues of more than $10 billion based on fiscal year 2014 performance, strengthening its leadership position in the $300 billion global beauty industry. Together with P&G's businesses, Coty is expected to become the global leader in fragrances and to significantly enhance its position in color cosmetics. P&G's businesses include leading fragrance brands such as Hugo Boss, Dolce & Gabbana and Gucci and the color cosmetics brands COVERGIRL and Max Factor. The transaction also gives Coty an attractive new category in the beauty industry through the addition of P&G's hair color business, led by Wella and Clairol. The transaction will significantly expand Coty's geographical footprint, providing scale in large beauty markets like Brazil and Japan, while also increasing critical mass in important geographies in which Coty currently operates, such as in North America, Europe, the Middle East and Asia.

Bart Becht, Chairman and Interim CEO of Coty, commented: "With the Beauty talent from both sides and the fantastic portfolio of world-class brands, we have the opportunity to create a highly focused, pure-play leader and challenger in Beauty which can deliver exciting opportunities and benefits for employees, licensors, customers and suppliers. There is no question that with the broader offering of leading brands, strong brand support, the development of a better pipeline of innovative products and the much broader geographical reach and scale, Coty will strengthen its competitive position and ability to capitalize on revenue and profit growth opportunities over time. Additionally, our combined operational and financial platform will allow us to drive meaningful EPS accretion and generate substantial incremental free cash flow over the long term, giving us a strong balance sheet with a conservative leverage profile. All of this has the potential to lead to accelerated value creation for Coty shareholders."

**Impact of Transaction**

Based on fiscal year 2014 results, Coty and the P&G Beauty Business would have more than $10 billion in combined pro forma revenues, doubling the size of Coty. The P&G Beauty Business achieved revenues of $5.9 billion in the fiscal year ended June 2014, with a carve-out EBITDA of $1.2 billion, which excludes approximately $400 million of allocated overhead costs that will not be transferred with the business.

Coty expects to realize approximately $550 million in total cost savings on an annualized basis over the next three years, including the $400 million in non-

transferred costs and an incremental $150 million in additional cost synergies, equating to 10% of the acquired revenues. These savings, together with working capital improvement and growth prospects anticipated from the creation of a focused beauty player, is expected to drive material financial improvements. Coty anticipates incurring one-time costs of approximately $500 million related to the transaction, plus an additional $400 million of capital expenditures, over the next three years. Excluding the impact of transaction amortization, the combined pro forma increase to Coty's FY15 earnings per share base is approximately $0.33 to $0.39, including the assumed three year implementation of full run-rate synergies. At the close of the transaction, Coty expects to increase its annual dividend to $0.50 per share.

96.     Analysts were quick to point out the complications that could arise in connection with a large acquisition such as the P&G Merger. For instance, on June 16, 2015, *Reuters* published an article in which retail research firm Conlumino's Chief Executive, Neil Saunders, commented on the acquisition, stating, "[t]he deal is extremely transformative for Coty, but investors are uncertain of what this means for the company" and that "[t]he debt Coty will assume, fairly small savings and questions on how it will cope with the transition make investors nervous."

97.     Additionally, on July 9, 2015, *The Motley Fool* published an article in which Citi analyst Wendy Nicholson explained that "[t]he beauty brands on both sides of this merger have been struggling in recent years." The article continued to question the Individual Defendants' positive characterization of the Company's planned P&G acquisition, stating:

> Two wrongs don't necessarily make a right, even if the combination adds economies of scale and cross-selling opportunities. Moreover, Coty will shoulder some $3 billion of P&G Beauty's debt as part of this merger, which roughly doubles the company's total debt load without adding to its already slender cash reserves.
>
> So Coty's management faces a daunting task here. The company will take two brand portfolios, both in need of an operating makeover, and attempt to work out cost savings, marketing efficiencies, and other synergies between them. All of this must be done with a supermodel-slim margin of error, given the company's limited financial resources.

98.     By way of another example, on December 19, 2015, *The Motley Fool* published an article explaining that despite purported optimism surrounding the P&G Merger, "Morgan

Stanley analysts recently warned that the company could suffer from acquisition indigestion after the deal."

99.     The Company completed its acquisition of P&G on October 1, 2019.  In connection with the acquisition, the Company paid approximately $12 billion.

100.    Following the P&G Merger, analysts continued to point to certain drawbacks regarding the acquisition and the Company's inadequate assessment of the costs associated with the acquisition. On August 22, 2017, *The Motley Fool* published an article stating that "fixed expenses in the acquired businesses are turning out to be higher than management expected," and that "Coty management is apparently just now learning about some of the challenges that the acquired P&G beauty business is facing."

101.    Between August 2018 and January 2019, the Company underwent a series of management changes, including: (i) on August 21, 2018, the Company revealed that Defendant Talhouët, the Company's then-CFO, would be stepping down from his position with the Company, effective February 1, 2019; (ii) on November 11, 2018, the Company revealed that Defendant Pane, the Company's then-CEO, would be stepping down from his positions with the Company, effective immediately, and that Defendant Laubies had been appointed to the position of CEO and director, effective immediately; (iii) on November 12, 2018, the Company revealed that Defendant Becht would be stepping down from his role as the Company's Chairman of the Board; (iv) on January 10, 2019, the Company revealed that Defendant Terisse, would be appointed as the Company's CFO, effective February 1, 2019; and (v) on January 14, 2019, the Company revealed that Defendant Becht would be stepping down from his position on the Board.

102.    Then, in mid-November 2019, the Company announced that it had entered into a purchase agreement with King Kylie, LLC, a Delaware limited liability company ("King Kylie")

to acquire a 51% ownership stake in the Kylie Brands for approximately $600 million. Specifically, in a press release issued on November 18, 2019 titled "Coty and Jenner Announce Strategic Partnership to Expand Beauty Brands Globally," the Company stated the following:

> NEW YORK--(BUSINESS WIRE)-- Coty Inc. (NYSE:COTY) and Kylie Jenner announced today that they have entered into a long-term strategic partnership in order to jointly build and further develop Kylie's existing beauty business into a global powerhouse brand. Together, Coty and Kylie will set and lead the strategic direction of the partnership, focusing on global expansion and entry into new beauty categories. Kylie and her team will continue to lead all creative efforts in terms of product and communications initiatives, building on her unrivalled global reach capabilities through social media.
>
> Kylie is one of the world's most admired personalities with over 270 million followers across her personal and brand social media channels, as well as being one of the most influential voices among beauty consumers globally. Both of her brands, Kylie Cosmetics and Kylie Skin, are two of the fastest-growing and most-engaged beauty brands on social media.
>
> The transaction is also a key milestone in Coty's ongoing transformation into a more focused and agile company. Coty will have overall responsibility for the portfolio's development, leveraging its global knowledge and capabilities in R&D, manufacturing, distribution, commercial and go-to-market expertise, as well as its deep understanding of the fragrances, cosmetics and skincare categories. In addition to its responsibilities within the partnership, Coty will act as a licensee for skincare, fragrances, and nail products.
>
> Through the partnership each party will leverage its unique strengths to further build a high growth, digitally native beauty brand.
>
> Pierre Laubies, Coty Chief Executive Officer, added, "We are pleased to welcome Kylie into our organization and family. Combining Kylie's creative vision and unparalleled consumer interest with Coty's expertise and leadership in prestige beauty products is an exciting next step in our transformation and will leverage our core strengths around fragrances, cosmetics and skincare, allowing Kylie's brands to reach their full potential."
>
> Kylie Jenner commented: "I'm excited to partner with Coty to continue to reach even more fans of Kylie Cosmetics and Kylie Skin around the world. I look forward to continuing the creativity and ingenuity for each collection that consumers have come to expect and engaging with my fans across social media. This partnership will allow me and my team to stay focused on the creation and development of each product while building the brand into an international beauty powerhouse."

Peter Harf, Chairman of the Board, said, "This new partnership between Kylie and Coty is an exciting step in Coty's renewed emphasis on its beauty business. Kylie is a modern-day icon, with an incredible sense of the beauty consumer, and we believe in the high potential of building a global beauty brand together."

Under the terms of the agreement, Coty will acquire a 51% ownership in the partnership for $600M. Coty expects the transaction will be accretive to the net revenue growth of its core fragrance, cosmetics and skin care portfolio by more than 1% p.a. over the next three years. The transaction is expected to be neutral to Coty's earnings per share (EPS) in year one, and accretive thereafter. The ROIC of the transaction is expected to exceed Coty's cost of capital by Fiscal 2023. Kylie Cosmetics realized an estimated $177M net revenues for the trailing twelve months (TTM).

The acquisition is expected to close in the third quarter of fiscal year 2020. All beauty categories within the new partnership will continue to be sold through leading luxury beauty retailers as well as owned digital channels.

103.    Analysts    were    quick    to    question    the    Individual    Defendants'    positive characterization of the Company's planned Kylie Brands acquisition. For instance, on February 22, 2020, *The Motley Fool* published an article which pointed to "[p]otential downsides to the Kylie deal," stating:

This isn't Coty's first attempt at improving its fortunes through a brand acquisition. Back in 2016, the company purchased Max Factor, Clairol, CoverGirl, and other cosmetics and perfume brands from **Procter & Gamble Company** (NYSE:PG) for a whopping $12 billion. On July 1, 2019, it announced a $3 billion writedown in the brands' value, causing its shares to tumble 14% in a single day.

While Terrise painted a rosy picture of the Kylie Beauty deal, some analysts appear less enamored. Coty paid a nearly 3.4x revenue multiple to acquire a brand consisting of little more than a few cosmetics formulas and a celebrity's personal Instagram following. Rakuten Intelligence, a company analyzing online sales, claimed that only 40% of online purchasers over the past three years bought Kylie products more than once, while reporting a 62% plunge in online sales year over year between May 2018 and May 2019.

Additionally, the unpredictable purchasing trends of Generation Z could potentially affect the long-term viability of Kylie. Surveys indicate that the number of Gen Z women using cosmetics every day in the 18 to 24 age group Kylie Beauty aims at is declining, from 50% in 2015 to 38% in 2019.

**False and Misleading Statements**

*October 3, 2016 Press Release*

104.    On October 3, 2016, the Company issued a press release announcing the completion of the P&G Merger. The press release quoted Defendant Becht, who stated, "Coty is now better positioned as we aim to become, over time, a global industry leader by being a clear challenger in beauty, delighting our consumers and creating long term shareholder value. … *we now have a much improved team, structure and culture to make the vision of this merger a reality*…"[8] The press release further emphasized the financial benefits of the transaction, stating:

> Coty aims to achieve a best-in-class profit margin and cash flow conversion model in an industry with attractive growth dynamics and modest private label penetration. Coty expects to achieve total cost savings of approximately $750, million or 16% of acquired revenues, through the transaction composed of: initial synergies, reflecting P&G costs that will not transfer, of approximately $350 million; and incremental cost synergies, to be recognized over four years, of approximately $400 million, achieved through a range of efficiency opportunities that the combination of the two businesses create.

> The merger synergies are expected to enhance Coty's already strong margins, cash flow generation and earnings power. Including anticipated synergies, Coty expects the P&G Specialty Beauty Business merger to:

> - Add approximately 500 to 600 basis points to Coty's stand-alone adjusted operating profit margins over a four-year period, resulting in margins of approximately 19.6% which would make Coty a margin leader relative to its Beauty peers.

> - Drive a pro forma increase to Coty's fiscal year 2016 adjusted earnings per share base of approximately $0.48, including the assumed four year implementation of full run-rate synergies.

> - Generate close to $1 billion in free cash flow by year two.

***November 9, 2016 Press Release & 1Q17 10-Q***

105.    On November 9, 2016, the Company issued a press release announcing its financial results for the fiscal quarter ended September 30, 2016. The press release disclosed that the

---

[8] Emphasis added.

Company had paid $11.6 billion for the P&G Beauty acquisition, and quoted Defendant Becht as

follows, in relevant part:

> We continue to target the total four-year synergies and working capital benefits of $750 million and $500 million, respectively, **with no change to the operating costs to realize both**."

***

> "It certainly will be a journey to realize the ambitions we have set for the company, and while **there may be challenges as we integrate and rebuild the businesses**, we are firmly committed to realizing the ambitions we have and delivering value for all our shareholders."

106.    Also on November 9, 2016, the Company filed its quarterly report on Form 10-Q

for the fiscal quarter ended September 30, 2016 with the SEC (the "1Q17 10-Q"). The 1Q17 10-

Q was signed by Defendants Pane and Talhouët, and contained certifications pursuant to Rule 13a-

14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed

by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained

therein, the disclosure of any material changes to the Company's internal controls, and the

disclosure of any fraud committed by the Company, its officers, or its directors.

107.    In its "Overview" section, the 1Q17 10-Q provided:

> **Further, in connection with the [P&G Merger], we are implementing our plan through which we continue to target realizing approximately $750 million of potential synergies driven by cost, procurement, supply chain and SG&A savings over the next four years**.

(Emphasis added.)

108.    The 1Q17 10-Q stated the following regarding the Company's internal controls:

> There were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(f) of the Exchange Act during the first fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***

Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives *and are effective at the reasonable assurance level*.

(Emphasis added.)

109.    The 1Q17 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2016. *Based on the evaluation of our disclosure controls and procedures as of September 30, 2016, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level*.

(Emphasis added.)

### The Truth Regarding the P&G Merger Gradually Emerges as False and Misleading Statements Continue

#### *February 9, 2017 Press Release & 2Q17 10-Q*

110.    On February 9, 2017, before the market opened, Coty issued a press release announcing the Company's financial results for the fiscal quarter ended December 31, 2016. In the press release, although the Company divulged that "negative transitional impacts especially

including significant trade inventory build in the first quarter of fiscal 2017 in parts of the P&G

business," Coty declared those "negative transitional impacts" to be "*short-term.*"[9]

111.    Also in the press release, Defendant Pane commented that "[t]he business was

impacted by significantly higher-than-anticipated inventory levels in the market on the acquired

P&G Beauty Business, competitive pressure in the Consumer Beauty division and the distraction

associated with the merger integration efforts." However, Defendant Pane assured investors that

the issues were "*short term challenges like the ones we faced in the first semester*" and that, with

respect to the merger, Coty was "reiterating [its] previously communicated $750 million synergy

target by fiscal 2020." Defendant Pane also confidently declared, *"[t]he integration is progressing*

*as expected, with no major issues to date*."[10]

112.    On this news, the price of the Company's stock fell approximately 8.8%, or $1.76,

dropping from $20.04 per share at the close of trading on February 8, 2017 to $18.28 per share at

the close of trading on February 10, 2017, following two days of heavy trading volume.

113.    Also on February 9, 2017, the Company filed its quarterly report on Form 10-Q for

the fiscal quarter ended December 31, 2016 with the SEC (the "2Q17 10-Q"). The 2Q17 10-Q was

signed by Defendants Pane and Talhouët, and contained SOX certifications signed by Defendants

Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

114.    In its "Overview" section, the 2Q17 10-Q maintained:

The diversion of resources to closing the [P&G Merger] and integrating the P&G
Beauty Business, the recent changes in our management teams as we reorganized
our business and transitional factors, including significantly higher than expected
trade inventory prior to the closing of the [P&G Merger], have negatively impacted

---

[9] Emphasis added.
[10] Emphasis added.

our results from certain P&G Beauty Business brands. We intend to exit our transition services agreement with P&G in stages during the course of calendar year 2017…

\*\*\*

***Further, in connection with the [P&G Merger], we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and SG&A savings over the next four years. We expect to cumulatively generate approximately 20% of the net synergies through fiscal 2017, approximately 50% through fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.***

(Emphasis added.)

115.    The 2Q17 10-Q stated the following regarding the Company's internal controls:

Except as described below, there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(f) of the Exchange Act during the second fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

On October 1, 2016, we completed the acquisition of the P&G Beauty Business. The P&G Beauty Business accounted for 44% of our total assets as of December 31, 2016 and 48% of our total net sales for the six months ended December 31, 2016. As part of our ongoing integration of the P&G Beauty Business, we are continuing to incorporate our controls and procedures into the P&G Beauty Business subsidiaries and to augment our company-wide controls to reflect the risks inherent in an acquisition of this type. As permitted by the SEC guidance for newly acquired businesses, our report on our internal control over financial reporting in the Annual Report on Form 10-K for the year ending June 30, 2017 will include a scope exception that excludes the acquired P&G Beauty Business subsidiaries in order for management to have sufficient time to evaluate and implement our internal control structure over the operations of the P&G Beauty Business.

\*\*\*

Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

116.    The 2Q17 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2016. As permitted by SEC guidance for newly acquired businesses, this evaluation did not include an assessment of those disclosure controls and procedures that are subsumed by, and did not include an assessment of internal control over financial reporting as it relates to, P&G Beauty Business, which was acquired on October 1, 2016. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2016, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

### *May 10, 2017 Press Release & 3Q17 10-Q*

117.    On May 10, 2017, the Company published a press release announcing its financial results for the fiscal quarter ended March 31, 2017. In the press release, Defendant Pane stated that "we are making good progress" with respect to the integration of P&G Beauty.

118.    Also on May 10, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2017 with the SEC (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Pane and Talhouët, and contained SOX certifications signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure

of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

119.     In its "Business Overview" section, the 3Q17 10-Q maintained:

The diversion of resources to closing the [P&G Merger] and integrating the P&G Beauty Business, the recent changes in our management teams as we reorganized our business and transitional factors, including significantly higher than expected trade inventory prior to the closing of the [P&G Merger], have negatively impacted our fiscal year-to-date results from certain P&G Beauty Business brands. However, we successfully exited the first stage of our transition services agreement with P&G in our North American business, which positively impacted our quarterly results. We intend to exit the remaining stages of the transition services agreement in stages during the course of calendar year 2017…

***

***Further, in connection with the [P&G Merger], we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings over the next four years. We expect to cumulatively generate approximately 20% of the net synergies through fiscal 2017, approximately 50% through fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.***

(Emphasis added.)

120.     The 3Q17 10-Q stated the following regarding the Company's internal controls:

Except as described below, there were no changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(f) of the Exchange Act during the second fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We completed the acquisitions of the P&G Beauty Business, ghd, and Younique on October 1, 2016, November 21, 2016 and February 1, 2017, respectively. Collectively, the P&G Beauty Business, ghd and Younique accounted for 48% of our total assets as of March 31, 2017 and 42% of our total net sales for the nine months ended March 31, 2017. As part of our ongoing integration of the P&G Beauty Business, ghd and Younique we are continuing to incorporate our controls and procedures into these subsidiaries and to augment our company-wide controls to reflect the risks inherent in these acquisitions. As permitted by the SEC guidance for newly acquired businesses, our report on our internal control over financial reporting in the Annual Report on Form 10-K for the year ending June 30, 2017

will include a scope exception that excludes the acquired P&G Beauty Business, ghd and Younique subsidiaries in order for management to have sufficient time to evaluate and implement our internal control structure over the operations of these subsidiaries.

***

Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

121.    The 3Q17 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

122.    We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

123.    Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2017. As permitted by SEC guidance for newly acquired businesses, this evaluation did not include an assessment of those disclosure controls and procedures that are subsumed by, and did not include an assessment of internal control over financial reporting as it relates to, the P&G Beauty Business, ghd, and Younique which were acquired on October 1, 2016, November 21, 2016 and February 1, 2017, respectively. ***Based on the evaluation of our disclosure controls and procedures as of March 31, 2017, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***August 22, 2017 Press Release & 2017 10-K***

124.     On August 22, 2017, before the market opened, the Company circulated a press release announcing its financial results for the fiscal quarter and full year ended June 30, 2017. The press release reported a 10% decline in organic consumer beauty net revenue and attributed the drop to, among other things, "weakness in several of the acquired P&G Beauty Business brands."

125.     In the press release, Defendant Pane acknowledged that "our Consumer Beauty division remains under pressure and its recovery is a key priority for us" but boasted that Coty "completed the incredibly complex acquisition of the P&G Beauty Business, fully reorganized into a product and customer focused organizational structure, successfully reached significant milestones in our integration efforts, and boosted [its] brand portfolio…"

126.     Defendant Pane again reiterated that Coty's "***integration efforts are proceeding well and we remain on track with the synergy delivery***."[11]

127.     On this news, the price of the Company's stock fell nearly 17%, or $3.31, declining from $19.55 per share at the close of trading on August 21, 2017 to $16.24 per share at the close of trading on August 24, 2017, following three days of heavy trading volume.

128.     On August 23, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 10-K").  The 2017 10-K was signed by Defendants Becht, Pane, Talhouët, Harf, Chalmers, Faber, Goudet, Michaels, Schoewel, and Singer, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

---

[11] Emphasis added.

129.    With respect to the P&G Merger, the 2017 10-K stated, in relevant part:

As previously disclosed in connection with the [P&G Merger], we expect to incur a total of approximately $1.2 billion of operating expenses and approximately $500 million of capital expenditures. Through June 30, 2017, we incurred life-to-date operating expenses and capital expenditures against these estimates of approximately $850 million and $250 million, respectively, and we expect the remaining operating expenses, including any anticipated restructuring activities, and capital expenditures to be incurred in future periods through fiscal 2020. *Further, in connection with the [P&G Merger], we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings over the next four years. We realized cumulative synergies of approximately 20% in fiscal 2017, and we expect to cumulatively generate approximately 50% of the net synergies through fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.*

(Emphasis added.)

130.    The 2017 10-K stated the following regarding the Company's internal controls:

Coty's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) of the Securities Exchange Act of 1934) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America ("GAAP"). Coty's internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets;
(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and
(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

We completed the acquisitions of certain assets and liabilities related to The Procter & Gamble Company's ("P&G") global fine fragrances, salon professional, cosmetics and retail hair color businesses, along with select hair styling brands (the "P&G Beauty Business"), 100% of the equity interest of Lion/Gloria Topco Limited which held the net assets of ghd ("ghd"), and 60% of the membership interest in Foundation, LLC which held the net assets of Younique, LLC, a Utah limited liability company ("Younique") on October 1, 2016, November 21, 2016 and February 1, 2017, respectively. As a result, we have excluded the internal controls of the P&G Beauty Business, ghd and Younique from our annual evaluation of the effectiveness of internal control over financial reporting for our Company. Collectively, the P&G Beauty Business, ghd and Younique accounted for 42% of our total assets as of June 30, 2017 and 45% of our total net sales for the year ended June 30, 2017.

Coty's management evaluated the effectiveness of internal control over financial reporting as of June 30, 2016 based on the criteria established in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on the evaluation, management has concluded that Coty maintained effective internal control over financial reporting as of June 30, 2017***.

(Emphasis added.)

131.    The 2017 10-K stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2017. ***Based on the evaluation of our disclosure controls and procedures as of June 30, 2017, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***September 28, 2017 Proxy Statement***

132.    On September 28, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Becht, Chalmers, Faber, Goudet, Harf, Michaels, Pane, Schoewel, and Singer solicited the 2017 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[12]

133.    With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated, "[w]e also have a Code of Business Conduct (the "Code") applicable to all our employees, officers and directors, including the Chief Executive Officer ("CEO"), the Chief Financial Officer ("CFO") and other senior officers."

134.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

135.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G Beauty; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for P&G Beauty; (3) the Company lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was

---

[12] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### November 9, 2017 Press Release & 1Q18 10-Q

136.    On November 9, 2017, the Company circulated a press release announcing its financial results for the fiscal quarter ended September 30, 2017. In the press release, Defendant Pane stated that "as of September 1, we have exited our third and final TSA with P&G for the ALMEA region **and now have control of processes, systems and data across the new Coty**."[13]

137.    Also on November 9, 2017, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2017 with the SEC (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Pane and Talhouët, and contained SOX certifications signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.    In its "Business Overview" section, the 1Q18 10-Q provided, in relevant part:

We successfully exited all three stages of our transition services agreement with P&G ("TSA exit"). The timing of shipment of orders related to the TSA exit, which benefited our fiscal 2017 fourth quarter net revenues, negatively impacted our first quarter net revenues, however, we expect no further impact going forward. We also instituted new initiatives to deliver meaningful, sustainable expense and cost management results to address increases in our fixed cost base as a combined company.

                                        ***

**Further, in connection with the acquisition of the P&G Beauty Business, we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings through fiscal 2020. We realized cumulative synergies of approximately 20% in fiscal 2017, and we expect to cumulatively generate approximately 50% of the net synergies throughout**

---

[13] Emphasis added.

***fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.***

(Emphasis added.)

139.    The 1Q18 10-Q stated the following regarding the Company's internal controls:

Except as described below, there were no other changes in our internal control over financial reporting identified in management's evaluation pursuant to Rules 13a-15(f) of the Exchange Act during first fiscal quarter that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

We completed the acquisitions of the P&G Beauty Business, ghd, and Younique on October 1, 2016, November 21, 2016 and February 1, 2017, respectively. Collectively, the P&G Beauty Business, ghd and Younique accounted for 47% of our total assets as of September 30, 2017 and 52% of our total net sales for the three months ended September 30, 2017. As part of our ongoing integration of the P&G Beauty Business, ghd and Younique we are continuing to incorporate our controls and procedures into these subsidiaries and to augment our company-wide controls to reflect the risks inherent in these acquisitions.

***

Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

140.    The 1Q18 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2017. As permitted by SEC guidance for newly acquired businesses, this evaluation did not include an assessment of those disclosure controls and procedures that are subsumed by, and did not include an assessment of internal control over financial reporting as it relates to, the P&G Beauty Business, ghd, and Younique, which were acquired on October 1, 2016, November 21, 2016 and February 1, 2017, respectively. *Based on the evaluation of our disclosure controls and procedures as of September 30, 2017, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level*.

(Emphasis added.)

### *February 8, 2018 Press Release & 2Q18 10-Q*

141.    On February 8, 2018, the Company issued a press release announcing its financial results for the fiscal quarter ended December 31, 2017. In the press release, Defendant Pane stated that "we continue to aim for a healthy improvement in the second half of the year versus the prior year, with most of the impact coming in Q4, *as we continue to deliver on our merger synergies*."[14]

142.    Also on February 8, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2017 with the SEC (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Pane and Talhouët, and contained SOX certifications signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

143.    In its "Business Overview" section, the 2Q18 10-Q maintained:

*Further, in connection with the acquisition of the P&G Beauty Business, we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings through fiscal 2020. We realized cumulative synergies of approximately 20% in fiscal 2017, and we expect to cumulatively generate approximately 50% of the net synergies throughout*

---

[14] Emphasis added.

***fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.***

(Emphasis added.)

144.   The 2Q18 10-Q stated the following regarding the Company's internal controls:

Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

145.   The 2Q18 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2017. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2017, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***May 9, 2018 Press Release, 3Q18 10-Q, & Earnings Call***

146.   On May 9, 2018, the Company issued a press release announcing its financial results for the fiscal quarter ended March 31, 2018. In the press release, Defendant Pane stated that the Consumer Beauty division "continued its uneven performance, but with encouraging signs of

stability."[15] Defendant Pane also reiterated his assurances from the press release published on February 8, 2018, and stated, in regards to adjusted operating margin, that Coty "continue[s] to aim for a healthy improvement in the second half of the year versus the prior year, with most of the impact coming in Q4, as [Coty] *continue[s] to deliver on our merger synergies*."

147.    Also on May 9, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Pane and Talhouët, and contained SOX certifications signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

148.    In its "Business Overview" section, the 3Q18 10-Q maintained:

Specifically, in connection with the P&G Beauty Business acquisition, we anticipated costs of approximately $1.2 billion of operating expenses and approximately $500 million of capital expenditures related to restructuring, integrating and optimizing the combined organization ("Global Integration Activities"). In the third quarter of fiscal 2018, we expanded the final stage of our integration plan by approximately $100 million of operating expenses for a total of approximately $1.3 billion.

*** 

*Further, in connection with the acquisition of the P&G Beauty Business, we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings through fiscal 2020. We realized cumulative synergies of approximately 20% in fiscal 2017, and we expect to cumulatively generate approximately 50% of the net synergies throughout fiscal 2018, approximately 80% through fiscal 2019 and the full $750 million through fiscal 2020.*

(Emphasis added.)

149.    The 3Q18 10-Q stated the following regarding the Company's internal controls:

---

[15] Emphasis added.

> Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

150.    The 3Q18 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

> We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

> Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2018. ***Based on the evaluation of our disclosure controls and procedures as of March 31, 2018, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

151.    The Company also held an earnings call on May 9, 2018 in connection with its financial results for the quarter. During the call, Defendant Telhouët confidently conveyed in his opening remarks that:

> The overall ***integration is progressing in line with our timetable***. As we advance towards the end of the integration, we have fine-tuned our original estimate made 2 years ago and have broadened the scope, including further go-to-market changes, systems enhancements and more complete one order, ***one shipment***, one invoice."

(Emphasis added.)

> ***August 21, 2018 Press Release & 2018 10-K***

152.    On August 21, 2018, the Company distributed a press release announcing its financial results for fiscal quarter and full year ended June 30, 2018. In the press release, Coty revealed that fourth quarter growth for "Consumer" and "Professional Beauty" was impacted by, among other things, "***short term*** supply chain disruptions resulting from the consolidation of warehouses and planning centers in North America and Europe, as the ex P&G business is integrated into Coty."[16] Defendant Pane also stated that the Consumer Beauty division "continued its uneven performance, but with encouraging signs of stability."

153.    However, Defendant Pane touted that "[t]he first half of [Coty's] synergies commitment has been delivered as planned by FY18" and continued to reassure investors by emphasizing that the short-term impacts would come to an end soon, stating, in relevant part:

> The peak of the impact of the supply chain disruptions due to our logistics and manufacturing consolidation will come in 1Q19, with a smaller tail end in 2Q19. This will have a significant impact on both top and bottom line, and together with the impact of our brand rationalization program, is expected to drive a low teens decline in our 1Q19 adjusted operating income year over year. Having said that, we do expect that these business integration related impacts will be largely over by the end of first half 2019 and our FY19 targets take these disruptions into consideration.

154.    Also on August 21, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended June 30, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Becht, Pane, Talhouët, Harf, Chalmers, Faber, Goudet, Michaels, Schoewel, and Singer, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Pane and Talhouët attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

155.    With respect to the P&G Merger, the 2018 10-K stated:

---

[16] Emphasis added.

Following our acquisition of the P&G Beauty Business, we have been focused on integrating, restructuring and optimizing the combined organization. In fiscal 2018, we successfully exited the third and final stage of our transition services agreement with P&G, following the successful exit of the first two stages in fiscal 2017. We also instituted new initiatives to deliver meaningful, sustainable expense and cost management to address increases in our fixed cost base as a combined company. The last step of the integration includes the completion of the one order, one invoice, one shipment program which will make Coty a fully integrated company, able to sell, ship and invoice all of our brands in a seamless way for our customers, allowing significant simplification for our employees and increasing our scalability potential.

***Further, in connection with the acquisition of the P&G Beauty Business, we are implementing our plan through which we continue to target realizing approximately $750 million of synergies driven by cost, procurement, supply chain and selling, general, and administrative savings through fiscal 2020. We realized cumulative synergies of approximately 20% in fiscal 2017, 50% though fiscal 2018, and we expect to cumulatively generate approximately 80% of the net synergies throughout fiscal 2019 and the full $750 million through fiscal 2020***.

(Emphasis added.)

156.    The 2018 10-K continued to provide, in relevant part:

We believe financial performance across quarters in fiscal 2019 will not be linear and the peak of the impact of the supply chain disruptions, due to logistics and manufacturing consolidation, will come in first half of fiscal 2019. We anticipate that this will have a considerable impact on both net revenue and net income. We do expect that the business disruption related impacts will be substantially complete by the end of first half fiscal 2019 and our fiscal 2019 targets take these disruptions into consideration.

157.    The 2018 10-K stated the following regarding the Company's internal controls:

Coty's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) of the Securities Exchange Act of 1934) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America ("GAAP"). Coty's internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets;
(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that

receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Coty's management evaluated the effectiveness of internal control over financial reporting as of June 30, 2018 based on the criteria established in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on the evaluation, management has concluded that Coty maintained effective internal control over financial reporting as of June 30, 2018***.

(Emphasis added.)

158.    The 2018 10-K stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2018. ***Based on the evaluation of our disclosure controls and procedures as of June 30, 2018, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***September 20, 2018 Proxy Statement***

159.    On September 20, 2018, the Company filed its 2018 Proxy Statement. Defendants

Becht, Chalmers, Faber, Goudet, Harf, Michaels, Pane, Schoewel, and Singer solicited the 2018

Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material

misstatements and omissions.[17]

160.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated,

"[w]e also have a Code of Business Conduct (the "Code") applicable to all our employees, officers

and directors, including the Chief Executive Officer ("CEO"), the Chief Financial Officer and

other senior officers."

161.    The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and

misleading statements alleged herein, and the Individual Defendants' failures to report violations

of the Code of Conduct.

162.    The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) Coty lacked

an adequate process to accurately assess and properly value the acquisition of beauty brands,

particularly P&G Beauty; (2) as a result of the foregoing, the Company overvalued and, therefore,

overpaid for P&G Beauty; (3) the Company lacked adequate and proper infrastructure, particularly

suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty

brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company

experienced sustained problems integrating the beauty brands Coty acquired from P&G and was

unable to realize the touted synergies that were meant to benefit the Company; and (5) the

---

[17] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### November 7, 2018 Press Release & 1Q19 10-Q

163.    On November 7, 2018, before the market opened, the Company distributed a press release announcing its financial results for the fiscal quarter ended September 30, 2018. In the press release, Coty reported an approximate decline of 9.2% in net revenue for the quarter, which represented a decline of approximately 7.7% relative to the same fiscal quarter one year prior. Coty attributed the larger than anticipated decline in revenue to "several temporary supply-chain related headwinds" including "[w]arehouse and planning center consolidation disruptions in Europe and the U.S., which impacted all three divisions."

164.    Defendant Pane acknowledged that "the increased scope of the [warehouse and planning center consolidation] disruptions resulted in much weaker results than previously expected."

165.    Although Defendant Pane conceded that the Company was still struggling to integrate after the Proctor and Gamble merger, he again continued to echo what he had previously stated:

> As a result of these disruptions, we have decided to modify our distribution center consolidation plan for the remainder of the year to minimize business impact. **With a healthy synergy delivery already in 1Q19, these modifications should have no impact to our commitment of $225 million of synergies in FY19 and $750 million total by the end of FY20.**

(Emphasis added.)

166.    Defendant Pane further asserted that **"[w]ith the P&G Beauty integration near completion**, and after we have overcome the internal challenges, we will be better equipped to focus more externally.[18]

167.    On this news, the price of the Company's stock fell approximately 25.8%, or $2.88, tumbling from $11.18 per share at the close of trading on November 6, 2018 to $8.30 per share at the close of trading on November 8, 2018, following two days of heavy trading volume.

168.    Also on November 7, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendant Pane and the Company's Interim CFO, non-party Ayesha Zafar ("Zafar"), and contained SOX certifications signed by Defendants Pane and Zafar attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

169.    In its "Overview" section, the 1Q19 10-Q provided, in relevant part, "[w]e have been working to remedy the supply chain issues, **and expect them to substantially resolve in the third quarter of fiscal 2019**.[19]

170.    The 1Q19 10-Q stated the following regarding the Company's internal controls:

Our management, including our CEO and Interim CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives **and are effective at the reasonable assurance level**.

(Emphasis added.)

171.    The 1Q19 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

---

[18] Emphasis added.
[19] Emphasis added.

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Interim Chief Financial Officer ("Interim CFO"), evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2018. ***Based on the evaluation of our disclosure controls and procedures as of September 30, 2018, our CEO and Interim CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

### *February 8, 2019 Press Release & 2Q19 10-Q*

172.   By way of press release issued on February 8, 2019, the Company reported its financial results for the fiscal quarter ended December 31, 2018. In the press release, Coty reported "strong sequential improvement" and attributed the Company's performance to "the combination of "several temporary factors" including "some moderation in the supply chain-related headwinds discussed in 1Q19."

173.   Additionally, in the press release, Defendant Laubies described the path forward for the Company's success from a financial standpoint, stating that Coty must, "manag[e] revenue and costs, improv[e] product mix and range, simplify[] our portfolio and formulations, and systemically deploy[] lean-inspired methodologies in our manufacturing and logistics operations." Defendant Pane confidently declared to investors that "the management team we have put into

place is the right one to develop this plan, and that together with the broader Coty organization, we will be able to meet the objectives of driving gross margin improvement."

174.    Also on February 8, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended December 31, 2018 with the SEC (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Laubies and Terisse, and contained SOX certifications signed by Defendants Laubies and Terisse attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

175.    In its "Overview" section, the 2Q19 10-Q affirmed that Coty "believe[s] we have resolved the most critical supply chain integration issues." Further, regarding the Company's recent management shakeup the 2Q19 10-Q provided, in relevant part:

> Our top priority has been taking the necessary steps to stabilize our business and build a sustainable foundation to position the Company for long-term success. The composition of our board of directors has evolved, and we implemented several executive leadership changes to drive our ongoing transformation and growth. Under the direction of our new leadership team, we are undertaking a broad review of the business with the objective of designing a strategic roadmap for consistent and profitable growth, with an emphasis on gross margin improvement. As part of this initiative, we may make changes to any of the current strategies for our business, brands, operations, capital allocation and organization. We expect to provide more details as management defines and implements this initiative.

176.    The 2Q19 10-Q stated the following regarding the Company's internal controls:

> Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives ***and are effective at the reasonable assurance level***.

(Emphasis added.)

177.    The 2Q19 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2018. ***Based on the evaluation of our disclosure controls and procedures as of December 31, 2018, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

### May 8, 2019 Press Release & 3Q19 10-Q

178.     On May 8, 2019, the Company circulated a press release announcing its financial results for the fiscal quarter ended March 31, 2019. The press release reported that "we largely resolved the supply constraints across all divisions, resulting in a significant reduction in supply chain-related headwinds in 3Q19 and a minimal expected impact in 4Q19." In the press release, Defendant Laubies also confirmed that "[t]hird quarter results clearly indicate that ***supply issues are largely resolved*** and we expect very limited impact from supply chain disruption on the business in the remainder of fiscal 2019."[20]

179.     Also on May 8, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Laubies and Terisse, and contained SOX certifications signed by Defendants Laubies and Terisse attesting to the accuracy of the financial statements contained therein, the

---

[20] Emphasis added.

disclosure of any material changes to the Company's internal controls, and the disclosure of any

fraud committed by the Company, its officers, or its directors.

180.     In its "Overview" section, the 3Q19 10-Q affirmed that "*we have resolved the most*

*critical supply chain issues*."[21]

181.     The 3Q19 10-Q stated the following regarding the Company's internal controls:

Our management, including our CEO and CFO, believes that our disclosure
controls and procedures and internal control over financial reporting are designed
to provide reasonable assurance of achieving our objectives *and are effective at the
reasonable assurance level*.

(Emphasis added.)

182.     The 3Q19 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e)
under the Exchange Act, that are designed to ensure that information required to be
disclosed by a company in the reports that it files or submits under the Exchange
Act is recorded, processed, summarized and reported within the time periods
specified in the SEC's rules and forms. Disclosure controls and procedures include,
without limitation, controls and procedures designed to ensure that information
required to be disclosed by a company in the reports that it files or submits under
the Exchange Act is accumulated and communicated to our management, including
its principal executive and principal financial officers, as appropriate to allow
timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the
"CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of
our disclosure controls and procedures as of March 31, 2019. ***Based on the
evaluation of our disclosure controls and procedures as of March 31, 2019, our
CEO and CFO concluded that, as of such date, our disclosure controls and
procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***July 1, 2019 Press Release & Business Update Call***

---

[21] Emphasis added.

183.    On July 1, 2019, the Company issued a press release in which it announced a four-year restructuring "Turnaround Plan" to drive substantial improvement in Consumer Beauty. In the press release, the Company also substantiated that Coty had overvalued P&G's Specialty Beauty Business in reporting that "Coty is in the process of completing its annual testing for impairment in light of the Turnaround Plan and related projections, and expects to record an impairment of its intangible assets of approximately $3 billion."

184.    During a business update call the Company held on that same day, Defendant Laubies confessed that "it is clear the difficulty of [the P&G Merger] lies at the heart of many of the issues that Coty has faced since then." Defendant Laubies explained that the "integration took longer and was more complex than originally envisioned" and that "many parts of the acquired business had weak performance since the merger." Defendant Laubies further stated that "the sustained commitment to meeting the financials [sic] targets set at the start of the deal limited the organization's ability to address some of the underlying trends."

185.    However, in acknowledging the merger-related problems the Company had experienced, Defendant Laubies also promised investors that "***we have now identified what we need to change in our company*** to be lasting and sustainable performance with the focus initially building a better business before we build a significantly bigger one."

186.    On this news, the price of the Company's stock fell approximately 14.3%, or $1.94, dropping from $13.53 per share at the open of trading on July 1, 2019 to $11.59 per share at the close of trading on July 1, 2019, on heavy trading volume.

***August 28, 2019 Press Release & 2019 10-K***

187.    On August 28, 2019, the Company issued a press release announcing its financial results for the fiscal quarter and full year ended June 30, 2019. The press release reported that "we now have *a clear business and financial framework* for the next four years." [22]

188.    Also on August 28, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended June 30, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Becht, Laubies, Terisse, Harf, Chalmers, Faber, Goudet, Kamenetzky, Michaels, Schoewel, and Singer, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Laubies and Terisse attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. The 2019 10-K reflected the Company's asset impairment charges and confirmed Coty's write down it had announced on July 1, 2019.

189.    The 2019 10-K stated the following regarding the Company's internal controls:

Coty's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) of the Securities Exchange Act of 1934) to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America ("GAAP"). Coty's internal control over financial reporting includes those policies and procedures that:

(i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets;
(ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors; and
(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.
Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

---

[22] Emphasis added.

Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Coty's management evaluated the effectiveness of internal control over financial reporting as of June 30, 2019 based on the criteria established in "Internal Control - Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on the evaluation, management has concluded that Coty maintained effective internal control over financial reporting as of June 30, 2019***.

190.    The 2019 10-K stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer ("CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2019. ***Based on the evaluation of our disclosure controls and procedures as of June 30, 2019, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

***September 24, 2019 Proxy Statement***

191.    On September 24, 2019, the Company filed its 2019 Proxy Statement. Defendants

Ballini, Chalmers, Creus, Denis, Goudet, Harf, Laubies, Michaels, Schoewel, and Singer solicited

the 2019 Proxy Statement pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[23]

192.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "[w]e also have a Code of Business Conduct (the "Code") applicable to all our employees, officers and directors, including the Chief Executive Officer ("CEO"), the Chief Financial Officer and other senior officers."

193.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

194.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G Beauty; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for P&G Beauty; (3) the Company lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

---

[23] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

195.    The statements referenced in ¶¶ 104–111, 113-126, 128-131, 136-158, 163-166, 168-185, 187-190 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G Beauty; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for P&G Beauty; (3) the Company lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### **False and Misleading Statements Regarding the Acquisition of Kylie Brands**

#### *November 18, 2019 Press Release*

196.    On November 18, 2019, the Company published a press release announcing that Coty had entered an agreement to expand its beauty brands. Specifically, the Company agreed to "build and further develop" Jenner's beauty business, which had achieved an estimated $177 million in net revenues for the previous twelve consecutive months. Under the terms of the deal, Coty would acquire "a 51% ownership in the partnership for $600 [million]." Notably, Jenner was featured as the "youngest-ever-self-made billionaire" on the cover of *Forbes* in August 2018.

#### *February 5, 2020 Press Release*

197.    On February 5, 2019, the Company issued a press release announcing its financial results for the fiscal quarter ended December 31, 2019. In the press release, Defendant Terisse stated that "we have now commenced a strategic partnership with Kylie Jenner, and we look forward to building a high growth, digitally native beauty brand."

### 3Q20 10-Q

198.    On May 11, 2019, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2020 with the SEC (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Laubies and Terisse, and contained SOX certifications signed by Defendants Laubies and Terisse attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

199.    In its "Business Combinations, Asset Acquisitions and Divestitures" section, regarding Coty's acquisition of Kylie Cosmetics, the 3Q19 10-Q provided, in relevant part:

> The Company estimated the preliminary fair value of acquired assets, liabilities and noncontrolling interest as of the date of acquisition based on information currently available. The Company is still evaluating the fair value of assets acquired and liabilities assumed. As the Company finalizes the fair value of assets acquired and liabilities assumed, additional purchase price adjustments may be recorded during the measurement period. The Company will reflect measurement period adjustments, if any, in the period in which the adjustments are recognized.

(Emphasis added.)

200.    The 3Q20 10-Q stated the following regarding the Company's internal controls:

> Our management, including our CEO and CFO, believes that our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving our objectives *and are effective at the reasonable assurance level*.

(Emphasis added.)

201.    The 3Q20 10-Q stated the following regarding the Company's disclosure controls:

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures," as defined in Rules 13a-15(e) under the Exchange Act, that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to our management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

Our management, with the participation of our Chief Executive Officer (the "CEO") and our Chief Financial Officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2020. ***Based on the evaluation of our disclosure controls and procedures as of March 31, 2020, our CEO and CFO concluded that, as of such date, our disclosure controls and procedures were effective at the reasonable assurance level***.

(Emphasis added.)

202.    The statements referenced in ¶¶ 196–201 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly the Kylie Brands; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for the Kylie Brands; and (3) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges Regarding the Acquisition of Kylie Brands**

***May 29, 2020 Forbes Article***

203.    On May 29, 2020, *Forbes* published an article (the "Forbes Article") titled "Inside Kylie Jenner's Web of Lies – And Why She's No Longer A Billionaire," which exposed that

Jenner "has been inflating the size and success of her business. For years." The Forbes article detailed:

> But in the deal's fine print, a less flattering truth emerged. Filings released by publicly traded Coty over the past six months lay bare one of the family's best-kept secrets: ***Kylie's business is significantly smaller, and less profitable, than the family has spent years leading the cosmetics industry and media outlets, including Forbes, to believe***.

***

> In a call with stock analysts, Coty's chief financial officer heralded the deal as "a compelling financial equation" that would help "make Coty a modern, growing and profitable beauty player." ***The analysts were immediately skeptical. It looked like Coty was paying way too much for a celebrity brand that could prove to be just a fad, one charged.*** Another asked how Coty could be sure Kylie will remain committed to promoting the business in the years to come.

> Then there were Kylie's financials. Revenues over a 12-month period preceding the deal: $177 million, according to the Coty presentation—***far lower than the published estimates at the time***. More problematic, Coty said that sales were up 40% from 2018, meaning the business only generated about $125 million that year, nowhere near the $360 million the Jenners had led *Forbes* to believe. Kylie's skin care line, which launched in May 2019, did $100 million in revenues in its first month and a half, Kylie's reps told us. The filings show the line was actually "on track" to finish the year with just $25 million in sales.

> "I think everybody was surprised," says Wissink, the Jefferies analyst, who was on the call. "The negative that came out of that announcement was that ***the business was a lot smaller than everybody had expected***."

> So much smaller, in fact, that there's virtually no way the numbers the Jenners were peddling in earlier years could be true either. If Kylie Cosmetics did $125 million in sales in 2018, how could it have done $307 million in 2016 (as the company's supposed tax returns state) or $330 million in 2017?

> One explanation: Kylie's business quietly fell by more than half in a single year. ***If so, Coty paid up for a "high-growth" brand that is actually a much smaller business than it was just a few years ago***. (Coty would not answer any questions about Kylie Cosmetics for this story.) Data from e-commerce firm Rakuten, which tracks a select number of receipts, suggests there was a 62% decline in Kylie's online sales between 2016 and 2018.

***

> Coty's share price has fallen more than 60% since the deal was struck, and even better-performing competitors like Ulta Beauty and Estée Lauder are still down single digits. ***Add that to the fact that Wall Street tends to think Coty paid too much to begin with*** and there is no way to realistically peg Kylie's net worth above a billion—despite her massive cash-out.

(Emphasis added.)

204.    On this news, the price of the Company's stock fell approximately 13.4%, or $0.56, tumbling from $4.19 per share at the close of trading on May 28, 2020 to $3.63 per share at the close of trading on May 29, 2019, on heavy trading volume. In total, from October 3, 2016 until May 28, 2020, the price per share of the Company's common stock plunged over 84.7%, or $20.16, from $23.79 per share to $3.63 per share.

## Repurchases

205.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $4.5 million to repurchase about 0.5 million shares of its own common stock at artificially inflated prices.

206.    According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 filed on November 6, 2019 with the SEC, during the three months ended September 30, 2019, the Company purchased approximately 0.5 million shares of its common stock for $4.5 million, at an average price of $9.00 per share.

207.    As the Company's stock was actually worth only $3.63 per share, the price at closing on May 28, 2020, the amount the Company overpaid for repurchases of its own stock during the three months ended September 30, 2019 was nearly $2.7 million.

208.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $2.7 million.

**DAMAGES TO COTY**

209.    As a direct and proximate result of the Individual Defendants' conduct, Coty will lose and expend many millions of dollars.

210.    Such losses include over $2.7 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

211.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, two of its former CEOs, its former interim CEO, its CFO, and its former CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

212.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

213.    As a direct and proximate result of the Individual Defendants' conduct, Coty has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**DERIVATIVE ALLEGATIONS**

214.    Plaintiff brings this action derivatively and for the benefit of Coty to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Coty, gross mismanagement, abuse of control, waste of

corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

215.    Coty is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

216.    Plaintiff is, and has been at all relevant times, a shareholder of Coty.  Plaintiff will adequately and fairly represent the interests of Coty in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

217.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

218.    A pre-suit demand on the Board of Coty is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following twelve individuals: Defendants Harf, Ballini, Goudet, Michaels, Schoewel, and Singer (the "Director-Defendants"), along with non-parties Sue Y. Nabi, Joachim Creus, Nancy Ford, Johannes Huth, Isabelle Parize, and Justine Tan (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time of the filing of this complaint.

219.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material fact while certain of the Individual Defendants engaged in insider sales based on material non-public information, and, at

the same time, to cause the Company to overpay by over $2.7 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

220.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, certain of the Individual Defendants sold Company stock at artificially inflated prices based on inside information.  As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

221.    Additional reasons that demand on Defendant Harf is futile follow.  Defendant Harf has served as the Company's Chairman of the Board since November 2018 and as a Company director since 1996. Defendant Harf previously served as the Company's interim CEO from May 31, 2020 until August 31, 2020, as CEO from 1993 to 2001, and as Chair of the Remuneration and Nominating Committee from 2011 to December 2016. Defendant Harf is also a Managing Partner and Chairman of JAB, having joined JAB in 1981. Additionally, Defendant Harf serves as Managing Director of Lucresca and Agnaten, privately-owned holding companies affiliated with JAB Group. Defendant Harf has received and continues to receive compensation for his role as a director as described above. As interim CEO and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

Furthermore, Defendant Harf signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K.  For these reasons, Defendant Harf breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222.    Additional reasons that demand on Defendant Ballini is futile follow. Defendant Ballini has served as a Company director since September 2019. She also serves as Chair of the Remuneration and Nominating Committee. Defendant Ballini has received and continues to receive compensation for her role as a director as described above. Defendant Ballini also serves as a senior member of the Retail Practice and as a leader of the board and CEO Advisory Partners group at Russell Reynolds Associates, which the Company has engaged for recruiting purposes.[24] As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Ballini breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

223.    Additional reasons that demand on Defendant Goudet is futile follow. Defendant Goudet has served as a Company director since 2013. He also has served as a Managing Partner and as CEO of JAB since 2012. Defendant Goudet has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting

---

[24] In fiscal 2020 and 2019, the Company engaged Russell Reynolds Associates for services in the amount of $600,000 and $100,000, respectively.

and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Goudet signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Goudet breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

224.   Additional reasons that demand on Defendant Michaels is futile follow. Defendant Michaels has served as a Company director since 2015. He also serves as a member of the Remuneration and Nomination Committee. Defendant Michaels has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Michaels signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Michaels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

225.   Additional reasons that demand on Defendant Schoewel is futile follow. Defendant Schoewel has served as a Company director since 2006. He also serves as a member of the Remuneration and Nomination Committee and Special Committee. Defendant Schoewel has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties

to protect corporate assets. Furthermore, Defendant Schoewel signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Schoewel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon his is futile and, therefore, excused.

226.    Additional reasons that demand on Defendant Singer is futile follow. Defendant Singer has served as a Company director since 2010. He also serves as a member of the Audit and Finance Committee, and as a member of the Special Committee. Defendant Singer may also serve on the boards of additional JAB affiliated or controlled entities, since the Company states that he "provides similar services to certain private companies affiliated with JAB."  Defendant Singer has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Singer signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, Defendant Singer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Non-party Nabi is the current CEO of Coty and has served in such capacity and as a Company director since September 2020. Thus, as the Company admits, she is a non-independent director. The Company provides Nabi with her principal occupation, and she is entitled to receive handsome compensation, including a base salary of €3,000,000. As the Company provides Nabi with her primary occupation and means of livelihood, it is unlikely that she would entertain a

demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining her compensation and evaluating her continued employment with Coty. Thus, demand upon non-party Nabi is futile as well.

228.    Additional reasons that demand on the Board is futile follow.

229.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by 2.7 million dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

230.    Defendants Chalmers and Singer (the "Audit Committee Defendants") served as members of the Audit and Finance Committee during the Relevant Period. Pursuant to the Company's Audit and Finance Committee Charter, the Audit and Finance Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's system of internal controls, the performance of the Company's internal audit function, and the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to Defendant Singer.

231.     Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, are beholden to and controlled by JAB, and Defendants Harf and Goudet who control the Company by virtue of their positions as Managing Partners, and Chairman and CEO, respectively, of JAB, which owns and controls the Company by virtue of its ownership, which provided JAB with approximately 60.3% of total shareholder voting power as of August 31, 2020. This shareholding provides JAB, and, in turn, Defendants Harf and Goudet with significant control over the continued employment of certain of the Director-Defendants, and especially Defendant Michaels, who sits on the Board of Krispy Kreme Doughnuts Corporation and Keurig Dr. Pepper Inc, JAB-affiliated entities. Thus, the Director-Defendants are unable to evaluate a demand with disinterest or independence as a result of JAB and, in turn, Defendants Harf's and Gouget's control over them.

232.     The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that precluded them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Schoewel served as an executive vice president under CEO Defendant Becht and Deputy Chairman Defendant Harf at Reckitt Benckiser PLC, prior to JAB's appointment of Defendant Schoewel to Coty's Board in 2006.

233.     Defendant Schoewel also had numerous non-profit ties to Defendants Harf and Faber, who serve on the board of the Benckiser Foundation and the Reimann family foundation along with Defendant Schoewel.

234.     Schoewel's family foundation relies on JAB support as one of the eleven foundations that the Benckiser Foundation provides with office space, joint workshops, lectures, development programs, and consulting services. Defendant Becht's family charitable trust made

substantial pledges to support Schoewel's family foundation, including: £100,000 in 2016, £100,000 in 2017, £150,000 in 2018, and £150,000 in 2019.

235.    Defendant Singer owes his lucrative positions at JAB-controlled entities to a long-standing and close relationship with Defendant Harf, whom he met through mutual friend and business partner Adrian Bellamy ("Bellamy"). In the 2000s, Defendant Harf started JAB's luxury goods group, Labelux, and then added Bellamy and Defendant Singer to the board of Labelux.

236.    From January 2005 to August 2017, Defendant Chalmers served as the Chief Legal & Corporate Affairs Officer and secretary of the board of AB InBev, during which time she reported to and formed a relationship with Defendant Harf, who was the chairman of AB InBev's board from 2002 to 2012. In 2012, Defendant Goudet succeeded Defendant Harf as AB InBev's chairman until 2017.[25] Defendant Chalmers worked closely with both Defendants Harf and Goudet during extensive and demanding endeavors to acquire Anheuser-Busch in 2008 and SABMiller in 2016, respectively.

237.    Moreover, Defendant Chalmers has close charitable ties with Defendant Harf, and has consistently supported his family's foundation, DKMS. For example, in 2016, Defendant Chalmers again worked under Defendants Harf (Co-Chair) and Goudet (Honorary Chair) as she served as the Vice Chair of DKMS's annual gala (the "Big Love Gala") hosted in New York. In 2017, Defendant Chalmers again served as the Big Love Gala's Vice Chair, and Defendants Harf and Goudet again served as Co-Chair and Honorary Chair, respectively. Additionally, Defendant Chalmers and her husband were one of six sponsors who contributed enough to the 2017 Big Love Gala to be recognized as Diamond Sponsors, the second highest sponsorship level the 2017 Big

---

[25] AB InBev requires a more substantial time commitment from its directors than a lot of other companies. At AB InBev, the board conducts eight regular meetings a year, plus additional meetings with management. If an acquisition is pending, as is often the case, there can be five to seven additional meetings.

Love Gala had promoted. Within ten days of the 2017 Big Love Gala, Defendant Chalmers was appointed to the Board. Moreover, in 2015, Defendants Chalmers and Defendant Harf served as co-chairs of the "Uniting for a Lyme-Free World" Inaugural Gala.

238.    In addition, Defendant Chalmers was beholden to Defendant Harf given her her board seat at AB InBev, which she was appointed to in 2019 as a result of Defendant Harf's close relationship with Belgian families—led by Alexandre Van Damme who has served on the board of Defendant Harf's family foundation—who owned Interbrew and are among the largest outside investors in JAB.

239.    By way of another example, as President of Mars from 2004 to January 2015, Defendant Michaels worked closely with and developed a tight-knit relationship with Defendant Goudet, who worked as Mars' CFO from 2004 to 2012. At Mars, Defendants Michaels and Goudet acquired Wrigley for approximately $23 billion in 2008 after pitching the deal to Wrigley Chairman, William Wrigley Jr., in Defendant Michael's kitchen. Moreover, Defendant Michaels also worked with Defendant Kamenetzky's husband, who was an executive at Mars from 2006 to 2016.

240.    Also, Defendant Goudet developed a close relationship with Defendant Laubies, who worked at Mars in various capacities, including as President of Europe, President of Latin America, and President of the Global Pet Care division, from 1988 to 2013. Defendant Goudet's loyalty to Defendant Laubies is apparent from his help in hiring Defendant Laubies as CEO of Jacobs Douwe Egberts, which was Defendant Goudet's first major acquisition after he joined JAB in 2012.

241.    Furthermore, three of the Director-Defendants have served on the Board for nearly a decade or longer and five of the Director-Defendants have served on the Board for five years or

longer.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

242.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.  In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

243.    Coty has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Coty any part of the damages Coty suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

244.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of

liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

245.    The acts complained of herein constitute violations of fiduciary duties owed by Coty's officers and directors, and these acts are incapable of ratification.

246.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Coty.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Coty, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

247.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Coty to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

248.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least six of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

249.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

251.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

252.     Under the direction and watch of the Directors, the 2017 Proxy Statement, 2018 Proxy Statement, and 2019 Proxy Statement (the "Proxy Statements") failed to disclose that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G Beauty; (2) as a result of the foregoing, the Company overvalued and,

therefore, overpaid for P&G Beauty; (3) the Company lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and support Coty's newly acquired beauty brands in connection with the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

253.    Moreover, the Proxy Statements were false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to issue false and misleading statements and/or omissions of material fact.

254.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

255.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Becht, Ballini, Chalmers, Faber, Goudet, Harf, Laubies, Michaels, Pane, Schoewel, and Singer, which allowed them to continue breaching their fiduciary duties to Coty.

256.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

257.    Plaintiff on behalf of Coty has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

258.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Coty. Not only is Coty now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Coty by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 0.5 million of its own shares on the open market at artificially-inflated prices, damaging Coty.

260.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

261.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Coty not misleading.

262.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by Coty.

263.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

264.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

265.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

266.    Plaintiff on behalf of Coty has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Violations of**
**Section 20(a) of the Securities Exchange Act of 1934**

267.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

268.    The Individual Defendants, by virtue of their positions with Coty and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Coty and each of its

officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Coty to engage in the illegal conduct and practices complained of herein.

269.    Plaintiff on behalf of Coty has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

270.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

271.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Coty's business and affairs.

272.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

273.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Coty.

274.    In breach of their fiduciary duties owed to Coty, the Individual Defendants willfully or recklessly caused the Company to made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Coty lacked an adequate process to accurately assess and properly value the acquisition of beauty brands, particularly P&G and the Kylie Brands; (2) as a result of the foregoing, the Company overvalued and, therefore, overpaid for P&G and the Kylie Brands; (3) the Company's lacked adequate and proper infrastructure, particularly suitable supply chain logistics, to efficiently integrate and

support Coty's newly acquired beauty brands in the P&G Merger; (4) as a further result of the foregoing, the Company experienced sustained problems integrating the beauty brands Coty acquired from P&G and was unable to realize the touted synergies that were meant to benefit the Company; and (5) the Company failed to maintain internal and disclosure controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

275.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

276.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

277.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase 0.5 million shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of nearly 37.6 million.

278.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Coty's securities and disguising insider sales.

279.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Coty's securities and disguising insider sales.

280.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

281.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Coty has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

282.    Plaintiff on behalf of Coty has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Unjust Enrichment**

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Coty.

285.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or

received bonuses, stock options, or similar compensation from Coty that was tied to the performance or artificially inflated valuation of Coty, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

286.    Plaintiff, as a shareholder and a representative of Coty, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

287.    Plaintiff on behalf of Coty has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

288.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Coty, for which they are legally responsible.

290.    As a direct and proximate result of the Individual Defendants' abuse of control, Coty has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Coty has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

291.    Plaintiff on behalf of Coty has no adequate remedy at law.

### SEVENTH CLAIM
**Against Individual Defendants for Gross Mismanagement**

292.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

293.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Coty in a manner consistent with the operations of a publicly-held corporation.

294.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Coty has sustained and will continue to sustain significant damages.

295.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

296.    Plaintiff on behalf of Coty has no adequate remedy at law.

### EIGHTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

297.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

298.    The Individual Defendants caused the Company to repurchase its own stock at artificially inflated prices, and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

299.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Coty to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions,

to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

300.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

301.    Plaintiff on behalf of Coty has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Coty, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Coty;

(c)    Determining and awarding to Coty the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Coty and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Coty and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Coty to nominate at least six candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Coty restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Dated: November 17, 2020                    Respectfully submitted,

                                            **THE BROWN LAW FIRM, P.C.**

                                            _/s/ Timothy Brown_
                                            Timothy Brown
                                            Saadia Hashmi
                                            240 Townsend Square
                                            Oyster Bay, NY 11771
                                            Telephone: (516) 922-5427
                                            Facsimile: (516) 344-6204
                                            Email: tbrown@thebrownlawfirm.net

## <u>VERIFICATION</u>

I,    Chris Lewis am    a    plaintiff in    the    within    action.
I have    reviewed    the    allegations    made    in    this    verified  consolidated
shareholder derivative    complaint,    know the contents thereof,    and    authorize    its    filing.
To    those allegations    of    which    I    have personal knowledge, I believe those allegations
to be true. As to those allegations of which I do not have personal knowledge, I rely upon
my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th
day of _____, 2020.

11/19/2020

Chris Lewis

9A6C3B39786D4AC...

Chris Lewis